# DR. MILES MEDICAL COMPANY v. JOHN D. PARK & SONS COMPANY.

## CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SIXTH CIRCUIT.

No. 72.   Argued January 4, 5, 1911.—Decided April 3, 1911.

An actionable wrong is committed by one who maliciously interferes with a contract between two parties and induces one of them to break the contract to the injury of the other, and in the absence of an adequate remedy at law equitable relief will be granted; but *held*, in this case, that plaintiffs were not entitled to relief as the contract under which they claimed was invalid.

A system of contracts between manufacturers and wholesale and retail merchants by which the manufacturers attempt to control not merely the prices at which its agents may sell its products, but the prices for all sales by all dealers at wholesale or retail whether purchasers or subpurchasers, eliminating all competition and fixing the amount which the consumer shall pay, amounts to restraint of trade and is invalid both at common law, and, so far as it affects interstate commerce, under the Sherman Anti-trust Act of July 2, 1890; and so *held* as to the contracts involved in this case.

Such agreements are not excepted from the general rule and rendered valid because they relate to proprietary medicines manufactured under a secret process but not under letters patent; nor is a manufacturer entitled to control prices on all sales of his own products in restraint of trade.

The rights enjoyed by a patentee are derived from statutory grant under authority conferred by the Constitution, and are the reward received in exchange for advantages derived by the public after the period of protection has expired; and the rights of one not disclosing his secret process so as to secure a patent are outside of the policy of the patent laws, and must be determined by the legal principles applicable to the ownership of such process.

The protection of an unpatented process of manufacture does not necessarily apply to the sale of articles manufactured under the process.

A manufacturer of unpatented proprietary medicines stands on the same footing as to right to control the sale of his product as the manufacturers of other articles, and the fact that the article may

have curative properties does not justify restrictions which are unlawful as to articles designed for other purposes.

A manufacturer of unpatented articles cannot, by rule or notice, in absence of statutory right, fix prices for future sales, even though the restriction be known to purchasers. Whatever rights the manufacturer may have in that respect must be by agreements that are lawful.

Although the earlier common-law doctrine in regard to restraint of trade has been substantially modified, the public interest is still the first consideration; to sustain the restraint it must be reasonable as to the public and parties and limited to what is reasonably necessary, under the circumstances, for the covenantee; otherwise restraints are void as against public policy.

Agreements or combinations between dealers, having for their sole purpose the destruction of competition and fixing of prices, are injurious to the public interest and void; nor are they saved by advantages which the participants expect to derive from the enhanced price to the consumer.

164 Fed. Rep. 803, affirmed.

THIS is a writ of certiorari to review a judgment of the Circuit Court of Appeals for the Sixth Circuit which affirmed a judgment of the Circuit Court dismissing, on demurrer, the bill of complaint for want of equity. 164 Fed. Rep. 803; 90 C. C. A. 579.

The complainant Dr. Miles Medical Company, an Indiana corporation, is engaged in the manufacture and sale of proprietary medicines, prepared by means of secret methods and formulas and identified by distinctive packages, labels and trade-marks. It has established an extensive trade throughout the United States and in certain foreign countries. It has been its practice to sell its medicines to jobbers and wholesale druggists who in turn sell to retail druggists for sale to the consumer. In the case of each remedy, it has fixed not only the price of its own sales to jobbers and wholesale dealers, but also the wholesale and retail prices. The bill alleged that most of its sales were made through retail druggists and that the demand for its remedies largely depended upon their

good will and commendation, and their ability to realize a fair profit; that certain retail establishments, particularly those known as department stores, had inaugurated a "cut-rate" or "cut-price" system which had caused "much confusion, trouble and damage" to the complainant's business and "injuriously affected the reputation" and "depleted the sales" of its remedies; that this injury resulted "from the fact that the majority of retail druggists as a rule cannot, or believe that they cannot realize sufficient profits" by the sale of the medicines "at the cut-prices announced by the cut-rate and department stores," and therefore are "unwilling to, and do not keep" the medicines "in stock" or "if kept in stock, do not urge or favor sales thereof, but endeavor to foist off some similar remedy or substitute, and from the fact that in the public mind an article advertised or announced at 'cut' or 'reduced' price from the established price suffers loss of reputation and becomes of inferior value and demand."

It was further alleged that for the purpose of protecting "its trade sales and business" and of conserving "its good will and reputation" the complainant had established a method "of governing, regulating and controlling the sale and marketing "of its remedies, which is thus described in the bill:

"Contracts in writing were required to be executed by all jobbers and wholesale druggists to whom your orator sold its aforesaid remedies, medicines and cures, of the following tenor and effect:

"*Consignment Contract—Wholesale.*

"The Dr. Miles Medical Company.

"This agreement made by and between The Dr. Miles Medical Company, a corporation, of Elkhart, Indiana, hereafter referred to as the Proprietor, and —— —— hereinafter referred to as the Consignee, Witnesseth:

"That the said Proprietor hereby appoints said Con-

signee one of its Wholesale Distributing Agents, and
agrees to consign to such Consignee for sale for the account
of said Proprietor such goods of its manufacture as the
Proprietor may deem necessary, the title thereto and
property therein to be and remain in the Proprietor ab-
solutely until sold under and in accordance with the pro-
visions hereof, and all unsold goods to be immediately
returned to said Proprietor on demand and the cancella-
tion of this agreement. Said goods to be invoiced to
consignee at the following prices:

"Medicines, of which the retail price is $1.00; $8.00
per dozen.

"Medicines (if any) of which the retail price is 50 cents;
$4.00 per dozen.

"Medicines, of which the retail price is 25 cents; $2.00
per dozen.

"Freight on all orders, the invoice price of which
amounts to $100.00 or more, to be prepaid by the Pro-
prietor; otherwise, freight to be paid by Consignee.

"Said Consignee agrees to confine the sale of all goods
and products of the said Proprietor strictly to and to sell
only to the designated Retail Agents of said Proprietor
as specified in lists of such Retail Agents furnished by
said Proprietor and alterable at the will of said Proprietor,
and to faithfully and promptly account and pay to the
Proprietor the proceeds of all sales, after deducting as
full compensation for all services, charges and disburse-
ments a commission of ten per cent of the invoice value,
and a further commission of five per cent on the net
amount of each consignment, after deducting the said
ten per cent commission, on all advances on account re-
mitted within ten days from date of any consignment,
it being agreed between the parties hereto that such ad-
vances shall in no manner affect the title to such goods,
which title shall remain in the Proprietor as if no such
advances had been made; provided that such advances

shall be repaid to said Consignee should the said Proprietor terminate this agreement and the return of any unsold goods on which advances have been made. Said Consignee guarantees the payment for all goods sold under this agreement and agrees to render a full account and remit the net proceeds on the first day of each month of and for the sales of the month preceding. Failure to make such accounting and remittance within ten days from the first of each month shall render the whole account payable and subject to draft, but the proceeds of such draft shall not affect the title of any unsold goods, which shall remain in the Proprietor until actually sold, as herein provided.

"It is further agreed that the Consignee shall furnish the Proprietor from time to time upon demand full statements of the stock of goods of the Proprietor on hand on any date specified and that a failure to furnish such statements within ten days from date of such demand shall be a sufficient cause for the cancellation of this agreement, and a demand for the return of the consigned goods.

"It is further agreed that the Proprietor will cause each retail package of its goods to be identified by a number and said Consignee hereby agrees to furnish the said Proprietor full reports upon proper cards or blanks furnished by said Proprietor of the disposition of each dozen or fraction of such goods by means of the identifying numbers, specifying the names and addresses of the Retail Agents to whom such goods have been delivered and the dates of such delivery, and to send such reports to said Proprietor at least semi-monthly, and at any other time on the request of said Proprietor.

"It is understood and agreed between the parties hereto that the commissions herein specified shall not be considered as earned by said Consignee upon any goods of said Proprietor which shall have been delivered to dealers not authorized agents of said Proprietor, as per list of

such agents, or upon any goods whose disposition by said Consignee shall not have been properly reported as herein provided, or sold at prices less than the prices authorized, and that said Consignee shall not credit any such commissions when making remittances on consignment account provided notice has been given by said Proprietor that such commissions are unearned; and that if such unearned commissions have been deducted by said Consignee in making advance payments or monthly remittances on account they shall be charged back to said Consignee and credited and paid to said Proprietor. It is understood that violation or nonobservance of any provision hereof by the Consignee shall make this agreement terminable and all unsold goods returnable at the option of the Proprietor.

"It is agreed that the goods of said Proprietor shall be sold by said Consignee only to the said Retail or Wholesale Agents of said Proprietor, as per list furnished, at not less than the following prices, to-wit:

"Medicines, of which the retail price is $1.00; $8.00 per dozen.

"Medicines (if any) of which the retail price is 50 cents; $4.00 per dozen.

"Medicines, of which the retail price is 25 cents; $2.00 per dozen.

"Provided, that said Consignee may allow a cash discount not exceeding one per cent, if paid within ten days from date of invoice, and that when sales at one time and at one invoice, amount to $15.00 or more, the said Consignee may allow three per cent trade discount, and if said purchase amounts to $50.00 or more, five per cent trade discount, all without cost to the Proprietor, and if such $50.00 quantity shall be shipped direct to the retail purchaser from the laboratory of said Proprietor, on the order from said Wholesale Distributing Agent, freight will be prepaid by the Proprietor, but not otherwise.

"This contract will take effect when the original, duly signed by the Consignee, has been received and accepted by The Dr. Miles Medical Company, at Elkhart, Indiana.

"Done under our hands —— ——, A. D. 1907.

"Fill in date on above line.

　　　　　　　　"THE DR. MILES MEDICAL COMPANY.

　　　　　　　　"—— ——, *Wholesale Dealer.*

"Sign your name on above line.

"Original.　Return in Enclosed Envelope."

"And written contracts were required with all retailers of your orator's said proprietary remedies, medicines and cures, as follows:

　　　　　　　　"*Retail Agency Contract.*

　　　　　　"The Dr. Miles Medical Company.

"This agreement between The Dr. Miles Medical Company of Elkhart, Indiana, and —— ——, of —— ——

"Retailer's Name on above line.　Town.　State.

"hereinafter referred to as Retail Agent, witnesseth:

　　　　　　　　"*Appointed Agent.*

"The said Dr. Miles Medical Company hereby appoints said Retail Dealer as one of the retail distributing agents of its Proprietary Medicines and agrees that said Retail Agent may purchase the Proprietary Medicines manufactured by said Dr. Miles Medical Company (each retail package of which the said Company will cause to be identified by a number) at the following prices, to wit:

　　　　　　　　"*Wholesale Prices.*

"Medicines, of which the retail price is $1.00; $8.00 per dozen.

"Medicines, of which the retail price is 50 cents; $4.00 per dozen.

"Medicines, of which the retail price is 25 cents; $2.00 per dozen.

　　　　　　　　"*Quantity Discount.*

"Provided that when purchases at one time and on one invoice amount to $15.00 (or more), Wholesale Dis-

tributing Agents are authorized to allow 3 per cent trade discount; if such purchase amounts to $50.00 (or more) 5 per cent trade discount will be allowed, and if such $50.00 quantity be shipped direct to the purchaser from the laboratory of said Dr. Miles Medical Company for the account of such Wholesale Agent, freight will be prepaid, but not otherwise.

### "Full Price.

"In consideration whereof said Retail Agent agrees in no case to sell or furnish the said Proprietary Medicines to any person, firm or corporation whatsoever, at less than the full retail price as printed on the packages, without reduction for quantity; and said Retail Agent further agrees not to sell the said Proprietary Medicines at any price to Wholesale or Retail dealers not accredited agents of the Dr. Miles Medical Company.

### "Violation.

"It is further agreed between the parties hereto that the giving of any article of value, or the making of any concession by means of trading stamps, cash register coupons, or otherwise, for the purpose of reducing the price above agreed upon shall be considered a violation of this agreement, and further it is agreed between the parties hereto that the Dr. Miles Medical Company will sustain damage in the sum of twenty-five dollars ($25.00) for each violation of any provision of this agreement, it being otherwise impossible to fix the measure of damage.

"This contract will take effect when a duplicate thereof, duly signed by the Retail Agent, has been received and approved by The Dr. Miles Company, at its office at Elkhart, Indiana.

"Done under our hands —— ——, A. D. 1907.

"Fill in date on above line.

                    "THE DR. MILES MEDICAL COMPANY.
            "———— ————, *Retail Dealer.*

"Sign your name on above line in ink.

"To Retail Dealer:

"Paste printed label, giving name and address, that your name may be correctly listed.

"Duplicate. Keep for reference."

As an aid to the maintenance of the prices thus fixed the company devised a system for tracing and identifying, through serial numbers and cards, each wholesale and retail package of its products.

It was alleged that all wholesale and retail druggists, "and all dealers in proprietary medicines," had been given full opportunity, without discrimination, to sign contracts in the form stated, and that such contracts were in force between the complainant "and over four hundred jobbers and wholesalers and twenty-five thousand retail dealers in proprietary medicines in the United States."

The defendant is a Kentucky corporation conducting a wholesale drug business. The bill alleged that the defendant had formerly dealt with the complainant and had full knowledge of all the facts relating to the trade in its medicines; that it had been requested, and refused, to enter into the wholesale contract required by the complainant; that in the city of Cincinnati, Ohio, where the defendant conducted a wholesale drug store, there were a large number of wholesale and retail druggists who had made contracts, of the sort described, with the complainant, and kept its medicines on sale pursuant to the agreed terms and conditions. It was charged that the defendant, "in combination and conspiracy with a number of wholesale and retail dealers in drugs and proprietary medicines, who have not entered into said wholesale and retail contracts" required by the complainant's system and solely for the purpose of selling the remedies to dealers "to be advertised, sold and marketed at cut-rates," and "to thus attract and secure custom and patronage for other merchandise, and not for the purpose of making or receiving a direct money profit" from the

sales of the remedies, had unlawfully and fraudulently procured them from the complainant's "wholesale and retail agents" by means "of false and fraudulent representations and statements, and by surreptitious and dishonest methods, and by persuading and inducing, directly and indirectly," a violation of their contracts.

It is further charged that the defendant, having procured the remedies in this manner, had advertised and sold them at less than the jobbing and retail prices established by the complainant; and that for the purpose of concealing the source of supply the identifying serial numbers, which had been stamped upon the labels and cartons, had been obliterated by the defendant or by those acting in collusion with the defendant, and the labels and cartons had been mutilated thus rendering the list of ailments and directions for use illegible, and that the remedies in this condition were sold both to the wholesale and retail dealers and ultimately to buyers for use at cut rates.

The bill prayed for an injunction restraining the defendant from inducing or attempting to induce any party to any of the said "wholesale or retail agency contracts" to "violate or break the same, or to sell or deliver to the defendant, or to any person for it" the complainant's remedies; from procuring or attempting to procure in any way any of these remedies from wholesale or retail dealers who had executed the contracts; from advertising, selling or offering for sale the remedies obtained by any of the described means at less "than the established retail price thereof" or to dealers who had not entered into contract with the complainant; from in any way obliterating, mutilating, removing or covering up the labels and cartons upon the bottles containing the remedies and from making sales without such labels and cartons, and the letter press and numerals thereon, being intact. There was also a prayer for an accounting.

The defendant demurred to the bill generally for want of equity and also specially to that portion of the bill which related to the mutilation and destruction of the identifying numbers and labels.

The Circuit Court sustained the demurrers and dismissed the bill and its judgment was affirmed by the Circuit Court of Appeals.

*Mr. Frank F. Reed,* with whom *Mr. Edward S. Rogers* was on the brief, for petitioner:

The wholesale contracts are agency contracts and not contracts of sale.

Under each contract between petitioner and wholesale dealers the remedies are in terms and in fact consigned to such wholesaler as a distributing agent. The wholesaler is designated as, and is actually made, an agent. Hence, each sale to a retailer is a sale by petitioner through its agent. The arrangement between petitioner and each wholesaler is clearly one of bailment and not of sale or conditional sale. *Milburn Co.* v. *Peak,* 89 Texas, 209; 34 S. W. Rep. 102; *Willcox & Gibbs Co.* v. *Ewing,* 141 U. S. 627; *York Mfg. Co.* v. *Cassell,* 201 U. S. 344; *Metropolitan Bank* v. *Benedict Co.,* 74 Fed. Rep. 182; *Atlas Glass Co.* v. *Ball Bros. Co.,* 87 Fed. Rep. 418; *Re Galt,* 120 Fed. Rep. 64; *Re Flanders,* 134 Fed. Rep. 560; *Briggs* v. *Foster,* 137 Fed. Rep. 773; *In re Fabian,* 151 Fed. Rep. 949; *In re McGehee,* 166 Fed. Rep. 928; *Franklin* v. *Stoughton Wagon Co.,* 168 Fed. Rep. 857; *Corbitt Buggy Co.* v. *Ricaud,* 169 Fed. Rep. 935; *Walter A. Wood Co.* v. *Vanstory,* 171 Fed. Rep. 375; *Butler Bros. Co.* v. *Rubber Co.,* 156 Fed. Rep. 1; *McCullough* v. *Porter,* 4 W. & S. (Pa.), 177; *Watch Case Co.* v. *Fourth St. Bank,* 194 Pa. St. 535; *Cannon Coal Co.* v. *Taggart,* 1 Colo. App. 60; *First National Bank* v. *Schween, Exr.,* 127 Illinois, 573; *Hunter* v. *Gordon,* 33 Ill. App. 464; *Lenz* v. *Harrison,* 148 Illinois, 598; *Bayliss* v. *Davis,* 47 Iowa, 340; *Norton* v. *Melick,* 97 Iowa, 564;

66 N. W. Rep. 780; *Eldridge* v. *Benson*, 61 Massachusetts, 483; *Hatch* v. *McBrien*, 83 Michigan, 159; 47 N. W. Rep. 214; *Olney* v. *Van Housen*, 3 Thomp. & C. 313; *Elwell* v. *Coon* (N. J.), 46 Atl. Rep. 580; *Lambeth Rope Co.* v. *Brigham*, 170 Massachusetts, 518; *Monitor Mfg. Co.* v. *Jones*, 96 Wisconsin, 619; *Reaper Co.* v. *Raynor*, 38 Wisconsin, 119; *Burton* v. *Goodspeed*, 69 Illinois, 237; *Walker* v. *Butterick*, 105 Massachusetts, 237; *Cordage Co.* v. *Sims*, 44 Nebraska, 148; 62 N. W. Rep. 514; *Sturm* v. *Boker*, 150 U. S. 312; *Balderston* v. *National Rubber Co.*, 18 R. I. 338; 27 Atl. Rep. 507; *Barnes Safe Co.* v. *Tobacco Co.*, 38 W. Va. 158; 18 S. E. Rep. 482; *National Bank* v. *Goodyear*, 90 Georgia, 711; 16 S. E. Rep. 962; *Moline Plow Co.* v. *Rodgers*, 53 Kansas, 743; 37 Pac. Rep. 111; *Fleet* v. *Hertz*, 201 Illinois, 594; *Re Columbus Buggy Co.*, 143 Fed. Rep. 859; *Re Smith & Nixon Piano Co.*, 149 Fed. Rep. 111. *Hartman* v. *J. D. Park Co.*, 145 Fed. Rep. 358; 153 Fed. Rep. 24; *Wells* v. *Abraham*, 146 Fed. Rep. 190; *Dr. Miles M. Co.* v. *Jayne Drug Co.*, 149 Fed. Rep. 838, were sales to jobbers and resale by the jobber to the retailer and distinguished from this case.

Petitioner may lawfully, through wholesale agents, impose terms and conditions upon retail buyers as to price and sale. There is no restraint of trade in agency contracts, whatever restrictions may be imposed upon the agent.

The principal controls the agent. *Rice* v. *Brook*, 20 Fed. Rep. 611, 613; *Weed* v. *Adams*, 37 Connecticut, 378, 380; *Barksdale* v. *Brown*, 1 Nott & McC. 517, 519; *Scott* v. *Rogers*, Abb. Dec. 157, 159; *Field* v. *Farrington*, 10 Wall. 141, 149; *Brown* v. *McGran*, 14 Pet. 479; *Cotton* v. *Hiller*, 52 Mississippi, 7, 13; *Union Hardware Co.* v. *Plume & Atwood Co.*, 58 Connecticut, 219; *Welsh* v. *Wind Mill Co.*, 89 Texas, 653; *Weiboldt* v. *Standard Fashion Co.*, 80 Ill. App. 67; *W. A. Wood Co.* v. *Greenwood Hardware Co.*, 75 S. Car. 378; *Keith* v. *Optical Co.*, 48 Arkansas,

138; *Roller* v. *Ott*, 14 Kansas, 609; *Newell* v. *Meyendorff*, 9 Montana, 254; *Payne* v. *Railway Co.*, 81 Tennessee, 507; *Whitwell* v. *Tobacco Co.*, 125 Fed. Rep. 454, 461; *Arkansas Brokerage Co.* v. *Dunn & Powell Co.*, 173 Fed. Rep. 899; *Robison* v. *Texas Pine Land Assn.*, 40 S. W. Rep. 843; *Hunt* v. *Simonds*, 19 Missouri, 583, 586; *Butterick Co.* v. *Rose*, 141 Wisconsin, 533; 124 N. W. Rep. 647; *Butterick Co.* v. *Fisher*, 203 Massachusetts, 122; 89 N. E. Rep. 189.

Any manufacturer or dealer may sell or refuse to sell at pleasure, and may fix prices, terms and conditions arbitrarily, either personally, or through an agent, when a sale is made; and provisions of the wholesale contract forbidding sales except to accredited retail dealers and except at fixed prices are no more in restraint of trade than the refusal of any trader to deal with anyone except on his own terms would be, or the refusal to sell except at his own price or to deal with persons who, for any reason or for no reason, may be objectionable. *Payne* v. *Railway Co.*, 81 Tennessee, 507; *Whitwell* v. *Tobacco Co.*, 125 Fed. Rep. 454; *C., C., C. & St. L. Ry. Co.* v. *Jenkins*, 174 Illinois, 398; *Live Stock Com. Co.* v. *Live Stock Exchange*, 143 Illinois, 210; *Tanenbaum* v. *N. Y. Fire Ins. Exch.*, 68 N. Y. Supp. 342; *Collins* v. *Am. News Co.*, 69 N. Y. Supp. 638; *Hunt* v. *Simons*, 19 Missouri, 583, 586; *Schulten* v. *Bavarian Brewing Co.*, 96 Kentucky, 224; *Baker* v. *Ins. Co.* (Ky.), 64 S. W. Rep. 913; *McCune* v. *Norwich Gas Co.*, 30 Connecticut, 521, 524; *N. Y. C. & St. L. Ry. Co.* v. *Schaffer*, 65 Oh. St. 414; *Brewster* v. *Miller*, 101 Kentucky, 368; *Anderson* v. *United States*, 171 U. S. 604; *Matthews* v. *Associated Press*. 136 N. Y. 333; 32 N. E. Rep. 981; *Star Publishing Co.* v. *Associated Press*, 159 Missouri, 410; *People* v. *Klaw*, 106 N. Y. Supp. 341, 347; *Union Pacific Coal Co.* v. *United States*, 173 Fed. Rep. 737.

Petitioner's system is legal, and not in restraint of

trade. Petitioner manufactures medicines under secret formulas which are its exclusive property. The medicines themselves embody trade secrets.

Contracts giving the exclusive right to sell the product of a maker in a certain territory are valid. Cases *supra* and *Roller* v. *Ott*, 14 Kansas, 609; *Newell* v. *Myendorff*, 9 Montana, 254; 23 Pac. Rep. 333; *Olmstead* v. *Distilling Co.*, 77 Fed. Rep. 265; *In re Greene*, 52 Fed. 104; *Ferris* v. *American Brew. Co.*, 155 Indiana, 539; 58 N. E. Rep. 701; *Woods* v. *Hart*, 50 Nebraska, 497; *Ward* v. *Hogan*, 11 Abb. N. S. 478; *Palmer* v. *Stebbins*, 3 Pick. 188; *Anheuser-Busch Assn.* v. *Houck*, 27 S. W. Rep. 692; *Fuqua* v. *Pabst Brew. Co.*, 36 S. W. Rep. 479; *Houck* v. *Wright*, 77 Mississippi, 476; *Vandeweghe* v. *American Brew. Co.*, 61 S. W. Rep. 526; *Gates* v. *Hooper*, 90 Texas, 563; *Norton* v. *Thomas*, 99 Texas, 578; *Clark* v. *Wire Fence Co.*, 22 Tex. Civ. App. 41.

Contracts for exclusive dealing in articles are valid. *Cable News Co.* v. *Stone*, 15 N. Y. Supp. 2; *Whitwell* v. *Continental Tob. Co.*, 125 Fed. Rep. 454; *Brown* v. *Rounsavell*, 78 Illinois, 589; *Clark* v. *Crosby*, 37 Vermont, 188; *Shade Roller Co.* v. *Cushman*, 143 Massachusetts, 353; *Blauner* v. *Williams Co.*, 36 Mississippi, 173; *Photographic Co.* v. *Grocery Co.*, 108 S. W. Rep. 768.

Contracts restricting the distribution or use of property are legal. *Phillips* v. *Iola Cement Co.*, 125 Fed. Rep. 593; *Meyer* v. *Estes*, 164 Massachusetts, 457; *Crystal Ice Co.* v. *Brewing Assn.*, 8 Tex. Civ. App. 1; *Bancroft* v. *Embossing Co.*, 72 N. H. 402; *Twomey* v. *People's Ice Co.*, 66 California, 233; *Schwalen* v. *Holmes*, 49 California, 665; *Hodge* v. *Sloan*, 107 N. Y. 244; *Kellogg* v. *Larkin*, 3 Chandler (Wis.), 133; *Lanyon* v. *Garden City Sand Co.*, 223 Illinois, 616; *Leslie* v. *Lorillard*, 110 N. Y. 519.

Contracts for the entire output of a plant are valid. *Carter-Crume Co.* v. *Peurrung*, 86 Fed. Rep. 439; *Heimbuecher* v. *Goff Co.*, 119 Ill. App. 373; *Over* v. *Foundry Co.*,

37 Ind. App. 452; *Van Marter* v. *Babcock,* 23 Barb. 633; *Hadden* v. *Dimmick,* 31 How. Pr. 196.

Restrictions on prices are valid. *Clark* v. *Frank,* 17 Mo. App. 602; *Commonwealth* v. *Grinstead,* 111 Kentucky, 203; *Elliman* v. *Carrington* (1901), 2 Ch. 275; 84 L. T. (N. S.) 858; *Walsh* v. *Dwight,* 58 N. Y. Supp. 91; *Rakemann* v. *Riverbank Imp. Co.,* 167 Massachusetts, 1; *Weiboldt* v. *Standard Fashion Co.,* 80 Ill. App. 67.

Trade secrets and articles embodying them are property monopolies and contracts relating thereto not within the restraint of trade rule.

This absolute dominion over and monopoly in inventions, discoveries and writings is the foundation of the patent and copyright laws and has been so declared in a long series of cases. *Press Publishing Co.* v. *Monroe,* 73 Fed. Rep. 196; *Holmes* v. *Hurst,* 174 U. S. 82; *Millar* v. *Taylor,* 4 Burr. 2303; *Jeffreys* v. *Boosey,* 4 H. L. C. 920; *Duke of Queensbury* v. *Shebbare,* 2 Eden, 329; *Prince Albert* v. *Strange,* 1 MacN. & G. 25; *S. C.,* 18 L. J. Ch. 120; *Bartlette* v. *Crittenden,* 4 McLean, 300; *Abernethy* v. *Hutchinson,* 3 L. J. (O. S.) 209; *Donaldson* v. *Beckett,* 2 Br. Par. Cas. 129; *Pope* v. *Curl,* 2 Atk. 342; *Caird* v. *Sime,* L. R. 12 App. C. 326; *Palmer* v. *DeWitt,* 47 N. Y. 532; *Thompkins* v. *Halleck,* 133 Massachusetts, 32.

To control the sale and prices of his own product by a manufacturer is valid and lawful when the article is made and sold under letters patent or copyright. *Patent cases: Bement* v. *National Harrow Co.,* 186 U. S. 70; *National Phonograph Co., Ltd.,* v. *Edison Bell Co.* (1907), L. R. 1 Ch. 335; 98 L. T. R. 291; *Consolidated Seeded Raisin Co.* v. *Griffin,* 126 Fed. Rep. 364; *Button Co.* v. *Eureka Specialty Co.,* 77 Fed. Rep. 288; *Phonograph Co.* v. *Kaufmann,* 105 Fed. Rep. 960; *Phonograph Co.* v. *Pike,* 116 Fed. Rep. 863; *Cortelyou* v. *Lowe,* 111 Fed. Rep. 1005; *Dickerson* v. *Matheson,* 57 Fed. Rep. 524; *Bonsack Machine Co.* v. *Smith,* 70 Fed. Rep. 383; *Bowling* v. *Taylor,* 40

Fed. Rep. 404; *Dickerson* v. *Tinling*, 84 Fed. Rep. 192; *Butterick Co.* v. *Rose*, 141 Wisconsin, 533; *Shade Roller Co.* v. *Cushman*, 143 Massachusetts, 353; 9 N. E. Rep. 629; *Glue Co.* v. *Russia Cement Co.*, 154 Massachusetts, 92; *Good* v. *Cordage Co.*, 121 N. Y. 1; *Machine Co.* v. *Morse*, 103 Massachusetts, 73; *Cortelyou* v. *Johnson*, 138 Fed. Rep. 110; *Bancroft* v. *Union Embossing Co.*, 72 N. H. 402; *Hulse* v. *Bonsack Machine Co.*, 65 Fed. Rep. 864; *Victor Co.* v. *The Fair*, 123 Fed. Rep. 424; *Phonograph Co.* v. *Schlegel*, 128 Fed. Rep. 733; *Whitson* v. *Columbia Co.*, 18 App. D. C. 525; *Rubber Tire Co.* v. *Rubber Works*, 142 Fed. Rep. 531; 154 Fed. Rep. 358; *Indiana Mfg. Co.* v. *Case Co.*, 154 Fed. Rep. 365. *Copyright cases: Straus* v. *Am. Pub. Assn.*, 177 N. Y. 473; *Murphy* v. *Press Assn.*, 56 N. Y. Supp. 597; *Newspaper Assn.* v. *O'Gorman Co.*, 147 Fed. Rep. 616; *Straus* v. *Am. Pub. Assn.*, 194 N. Y. 538.

The methods of manufacture and the articles made under trade secrets, when the article, as here, is itself a secret article with its ingredients and their proportions unknown and undisclosed by the article as sold and inspection thereof, are both property and legal monopolies. Until either voluntary disclosure to, or lawful discovery by, the public of the secret or process they are and continue to be protected as monopolies. *Powell* v. *Vinegar Co.*, 13 R. P. C. 235; 66 L. J., Ch. Div. 763; (1896) 2 Ch. 69; 14 R. P. C. 720, 728; (1897) A. C. 710; *Peabody* v. *Norfolk*, 98 Massachusetts, 452; *Stewart* v. *Hook*, 118 Georgia, 445; *Tabor* v. *Hoffman*, 118 N. Y. 30; *Eastman Co.* v. *Reichenbach*, 20 N. Y. Supp. 110; *Simmons Co.* v. *Waibel*, 1 So. Dak. 488; *National Tube Co.* v. *Eastern Tube Co.*, 13 O. Cir. Dec. 469, 471; *Board of Trade* v. *Christie Co.*, 198 U. S. 236; *Board of Trade* v. *Cella*, 145 Fed. Rep. 28; *Stone* v. *Goss* (N. J.), 55 Atl. Rep. 736; *Thum* v. *Tloczynski*, 114 Michigan, 149; *Westervelt* v. *National Paper Co.*, 154 Indiana, 673; *Salomon* v.

*Hertz,* 40 N. J. Eq. 400; *S. C.,* 2 Atl. Rep. 379; *Grand Rapids Wood Co.* v. *Hatt,* 152 Michigan, 132; *Extracting Co.* v. *Keystone Co.,* 176 Fed. Rep. 830; *Sanitas Nut Food Co.* v. *Cemer,* 134 Michigan, 370; *Detinning Co.* v. *Am. Can Co.,* 67 N. J. Eq. 243; *Taylor Iron & Steel Co.* v. *Nichols,* 70 N. J. Eq. 541; *National Gum Co.* v. *Braendly,* 51 N. Y. Supp. 93; *Harvey Co.* v. *Drug Co.,* 77 N. Y. Supp. 674; *Pressed Steel Car Co.* v. *Standard Steel Car Co.,* 210 Pa. St. 464; *Eastern Extracting Co.* v. *Greater N. Y. Ex. Co.,* 110 N. Y. Supp. 738; *Union Switch & Signal Co.* v. *Sperry,* 169 Fed. Rep. 926; *Wiggins Sons Co.* v. *Cott-A-Lap Co.,* 169 Fed. Rep. 150.

*Mr. Alton B. Parker,* with whom *Mr. William J. Shroder* was on the brief, for respondent:

The legal effect of the contracts between petitioner and wholesale drug dealers and jobbers is that of a contract of sale. *The Peoria Mfg. Co.* v. *Lyons,* 153 Illinois, 427; *Howell Son & Co.* v. *Boudor, Tr. et al.,* 95 Virginia, 815; *Conn* v. *Chambers,* 123 App. Div. (N. Y.) 298, aff'd, 195 N. Y. 538; *Yoder* v. *Howarth,* 57 Nebraska, 150; *Mack* v. *Tobacco Co.,* 48 Nebraska, 397; *Powder Co.* v. *Hilderbrand,* 137 Indiana, 462; *Gendre & Co.* v. *Kean,* 28 N. Y. Supp. 7; *Arbuckle Bros.* v. *Kirkpatrick & Co.,* 98 Tennessee, 221; *Arbuckle Bros.* v. *Gates & Brown,* 95 Virginia, 802; *Williams* v. *Tobacco Co.,* 21 Tex. Civ. App. 635; *Snelling* v. *Arbuckle Bros.,* 104 Georgia, 362; *Norwegian Plow Co.* v. *Clark,* 102 Iowa, 31; *De Kruif* v. *Flieman,* 130 Michigan, 12.

The contract is not one of agency. The petitioner has no peculiar, special or exclusive right in the articles manufactured by it, warranting it to carry out, with reference to their sale, a plan or scheme which would otherwise be invalid and illegal. *Mercantile Agency* v. *Jewelers' Pub. Co.,* 155 N. Y. 241; *Larrowe* v. *O'Loughlin,* 88 Fed. Rep. 896.

The attempt of the petitioner in this case is manifestly not only to acquire, without taking out a patent, rights which are only given under the patent and copyright laws, but to do that without complying with the condition on which alone such right can be obtained under such laws, to-wit: the abandonment of the right after a fixed period of time.  It is an attempt to maintain a scheme to give it for an unlimited period of time, or for all time to come, a right which the courts have uniformly held can only be obtained for a limited period of time under the patent and copyright laws.  Such a scheme is, in the absence of special right, illegal and unlawful.  *Wheaton* v. *Peters*, 8 Pet. 591; *Bement* v. *Harrow Company*, 186 U. S. 70; *Edison* v. *Kaufman*, 105 Fed. Rep. 960; *Edison* v. *Pike*, 116 Fed. Rep. 863; *Victor Talking Machine Co.* v. *The Fair*, 123 Fed. Rep. 424; *Park* v. *N. W. D. A.*, 175 N. Y. 1; *Strauss* v. *Am. Publishers' Assn.*, 177 N. Y. 473; *Gamewell* v. *Crane*, 160 Massachusetts, 50; *Vulcan Powder Co.* v. *Hercules Powder Co.*, 96 California, 510; *Tecktonius* v. *Scott*, 110 Wisconsin, 441; *Pasteur Vaccine Co.* v. *Burkey*, 22 Tex. Civ. Apps. 231; *Fox Pressed Steel Co.* v. *Schoen*, 77 Fed. Rep. 29; *Walsh* v. *Dwight*, 40 App. Div. 513; *Elliman* v. *Carrington* (1901), 2 Chan. 275; *Heaton &c. Co.* v. *Eureka Specialty Co.*, 77 Fed. Rep. 288.

That a patentee may make a contract which is lawful at common law does not warrant the converse of the proposition, *i. e.*, that persons having only common-law rights can make a contract warrantable only under the patent and copyright laws.

The control which the petitioner is attempting to maintain over the subsequent trade, by its vendees, in the goods manufactured by it, is in general restraint of trade and is therefore unlawful at common law.

A restraint of trade may affect the public directly, or the interests of the parties to the contract or agreement directly, and the public only indirectly.  2 Parsons on

Contracts, 7th ed., 887; *Alger* v. *Thatcher*, 19 Pick. 51; *Fowle* v. *Park*, 131 U. S. 88; *Central Transp. Co.* v. *Pullman Car Co.*, 139 U. S. 24, 53; *Vickery* v. *Welch*, 19 Pick. 523; *United States* v. *Addyston &c. Co.*, 85 Fed. Rep. 271.

The system established and maintained by the petitioner controls the entire trade in the articles manufactured by it and is necessarily a general restraint of the trade in the articles in question.

In *Oliver* v. *Gilmore*, 52 Fed. Rep. 562; *Dolph* v. *Troy*, 28 Fed. Rep. 523; *In re Greene*, 52 Rep. Fed. 104; *United States* v. *Nelson*, 52 Fed. Rep. 646; *Dueber Watch Co.* v. *Howard*, 55 Fed. Rep. 851; *Olmstead* v. *Distilling Co.*, 77 Fed. Rep. 265; *Phillips* v. *Iola Cement Co.*, 125 Fed. Rep. 593; *Knapp* v. *Jarvis*, 135 Fed. Rep. 1008; *Grogan* v. *Chaffee*, 156 California, 611; *Walsh* v. *Dwight*, 40 App. Div. 513, *Garst* v. *Harris*, 177 Massachusetts, 72; and *Garst* v. *Charles*, 187 Massachusetts, 144, the courts held the contracts not unlawful because the arrangement did not affect the entire commodity or the right of others to engage in the same business and hence affected in no way the general trade in the articles; and see also *Whitwell* v. *Tobacco Co.*, 125 Fed. Rep. 454; *Commonwealth* v. *Strauss*, 188 Massachusetts, 229; *United States* v. *Jellico &c. Co.*, 46 Fed. Rep. 432; *United States* v. *Coal Dealers' Assn. of Cal.*, 85 Fed. Rep. 252; *Chesapeake & Ohio Fuel Co.* v. *United States*, 115 Fed. Rep. 610; *United States* v. *Addyston &c. Co.*, 85 Fed. Rep. 271; aff'd 175 U. S. 211.

For contracts held illegal as constituting or tending to create a monopoly, because their effect was to control and regulate all or such a large proportion of the entire trade in an article of commerce as to affect injuriously the public interests, see *Cravens* v. *Carter*, 92 Fed. Rep. 479; *Montague* v. *Lowry*, 115 Fed. Rep. 27; *S. C.*, 193 U. S. 38; *Gibbs* v. *McNeeley*, 118 Fed. Rep. 120; *Swift & Co.* v. *United States*, 196 U. S. 375; *Getz* v. *Federal Salt Co.*, 147 California, 115; *Hunt* v. *Riverside Club*, 12 Det. Leg. N. 264; *Owen*

v. *Bryan*, 77 N. E. Rep. 302; *Clancy* v. *Onondaga &c. Co.*, 62 Barb. 395; *Dewitt Wire Cloth Co.* v. *N. J. Wire Cloth Co.*, 16 Daly, 529; *People* v. *Duke*, 19 Misc. (N. Y.) 292; *Tuscaloosa Ice Co.* v. *Williams*, 127 Alabama, 110; *Finch* v. *Granite Co.*, 187 Missouri, 244; *Charleston Co.* v. *Kanawha Co.*, 50 S. Car. 876; *Lowry* v. *Tile, Mantel & Grate Assn.*, 106 Fed. Rep. 38; *Ellis* v. *Inman*, 131 Fed. Rep. 182; *Cummings* v. *Union Blue Stone Co.*, 164 N. Y. 401, 404; *Cohen* v. *Envelope Co.*, 166 N. Y. 292; *Salt Co.* v. *Guthrie*, 35 Oh. St. 666; *Distilling Co.* v. *Moloney*, 156 Illinois, 448; *State* v. *Standard Oil Co.*, 49 Oh. St. 137; *People* v. *North River Sugar Co.*, 54 Hun, 345; aff'd 123 N. Y. 587; *Bishop* v. *Preservers' Co.*, 157 Illinois, 284; *Harding* v. *Glucose Co.*, 182 Illinois, 551; *Chicago &c. Coal Co.* v. *People*, 214 Illinois, 421; *Texas Standard Oil Co.* v. *Adone*, 83 Texas, 650; *State* v. *Armour Co.*, 173 Missouri, 356; *Santa Clara* v. *Hayes*, 76 California, 287; *Pacific Factor Co.* v. *Adler*, 90 California, 110; *Cleland* v. *Anderson*, 66 Nebraska, 252; *Brown* v. *Jacobs*, 115 Georgia, 429.

The restraint petitioner is attempting to maintain is, even if partial, unreasonable and therefore unlawful. *Parks & Sons* v. *Hartman*, 153 Fed. Rep. 24, 41.

The control the petitioner is attempting to maintain over the entire trade, in the goods manufactured by it, and the system of contracts by which it is attempting to carry out that purpose, are illegal, under the provisions of the Sherman Anti-trust Act.

Its goods are sold to the wholesale and jobbing druggists throughout nearly all of the States of the United States. This is interstate commerce. *Addyston* v. *United States*, 175 U. S. 211; *Montague* v. *Lowry*, 193 U. S. 38; *Swift & Co.* v. *United States*, 196 U. S. 375; *United States* v. *Trans-Missouri Freight Association*, 166 U. S. 290; and see *Lowe* v. *Lawlor*, 208 U. S. 274, 293.

The necessary effect of granting the relief would be to

create by judicial sanction a right which can only arise from statute.

The relief should not be granted because its effect would be to aid the petitioner in carrying out that which is unlawful. *Central Transp. Co.* v. *Pullman Palace Car Co.*, 139 U. S. 24; *Gibbs* v. *Gas Co.*, 130 U. S. 396; *Texas & P. Ry. Co.* v. *Southern Pac. Ry. Co.*, 41 La. Ann. 970; *Morris Run Coal Co.* v. *Barclay Coal Co.*, 68 Pa. St. 173; *Hooker* v. *Vandewater*, 4 Denio, 349; *Cummings* v. *Union Blue Stone Co.*, 164 N. Y. 401; *Emery* v. *Ohio Candle Co.*, 47 Oh. St. 320; 2 High on Injunctions, 3d ed., § 1106; 1 Pomeroy's Eq. Jurisp., §§ 402 *et seq.*

The bill does not set forth facts entitling the petitioner to relief against the respondent.

The mere allegation of knowledge on the part of the respondent of the petitioner's method of business, is not sufficient to warrant the relief restraining it from purchasing the goods. *Apollinaris Co.* v. *Scherer*, 27 Fed. Rep. 18, 21; *Sperry* v. *Hertzberg*, 60 Atl. Rep. 368; *Taddy* v. *Sterious* (1904), 1 Ch. Div. 254; *McGruther* v. *Pitcher* (1904), 2 Ch. Div. 306; *Garst* v. *Hall*, 179 Massachusetts, 588.

The mere inducement is not sufficient, it must be an unlawful inducement, or an inducement by misrepresentation and fraudulent and wrongful means. *National Phonograph Co.* v. *Edison-Bell Co.*, L. R. (1908) 1 Ch. Div. 335, 362, 371; *Benton* v. *Pratt*, 2 Wend. 385; *Rice* v. *Manley*, 66 N. Y. 82; *Angle* v. *Chicago &c. Ry. Co.*, 151 U. S. 1; *Garst* v. *Hall*, 179 Massachusetts, 588, *supra.*

The facts constituting such fraud, wrongful inducement and unlawful means, must be averred. *Setzar* v. *Wilson*, 4 Ired. (N. C.) 501; *McHenry* v. *Hazard*, 45 Barb. 657; *Hanson* v. *Langan*, 30 N. Y. St. Rep. 828; *Butler* v. *Viele*, 44 Barb. 166; *Reed* v. *Guano Co.*, 47 Hun, 410; *Bank* v. *Rochester*, 41 Barb. 341; *Hilson* v. *Libby*, 44 N. Y. Superior Ct. 12; *Benedict* v. *Dake*, 6 How. 352, 353; *Davenport* v.

*Taussig,* 31 Hun, 563; *Hazard* v. *Griswold,* 21 Fed. Rep. 178; *Savings Bank* v. *Supervisors,* 22 Fed. Rep. 580.

Petitioner has no cause of complaint because the respondent defaces and mutilates the labels or printed matter upon the packages which it purchases and owns.

MR. JUSTICE HUGHES, after making the above statement, delivered the opinion of the court.

The complainant, a manufacturer of proprietary medicines which are prepared in accordance with secret formulas, presents by its bill a system, carefully devised, by which it seeks to maintain certain prices fixed by it for all the sales of its products both at wholesale and retail. Its purpose is to establish minimum prices at which sales shall be made by its vendees and by all subsequent purchasers who traffic in its remedies. Its plan is thus to govern directly the entire trade in the medicines it manufactures, embracing interstate commerce as well as commerce within the States respectively. To accomplish this result it has adopted two forms of restrictive agreements limiting trade in the articles to those who become parties to one or the other. The one sort of contract known as *"Consignment Contract—Wholesale,"* has been made with over four hundred jobbers and wholesale dealers, and the other, described as *"Retail Agency Contract,"* with twenty-five thousand retail dealers in the United States.

The defendant is a wholesale drug concern which has refused to enter into the required contract, and is charged with procuring medicines for sale at "cut prices" by inducing those who have made the contracts to violate the restrictions. The complainant invokes the established doctrine that an actionable wrong is committed by one who maliciously interferes with a contract between two parties and induces one of them to break that contract to the injury of the other and that, in the absence of an ade-

quate remedy at law, equitable relief will be granted. *Angle* v. *Chicago, St. Paul, Minneapolis & Omaha Railway Co.,* 151 U. S. 1; *Bitterman* v. *Louisville & Nashville Railroad,* 207 U. S. 205.

The principal question is as to the validity of the restrictive agreements.

Preliminarily there are opposing contentions as to the construction of the agreements, or at least of that made with jobbers and wholesale dealers. The complainant insists that the "consignment contract" contemplates a true consignment for sale for account of the complainant, and that those who make sales under it are the complainant's agents and not its vendees. The court below did not so construe the agreement and considered it an effort "to disguise the wholesale dealers in the mask of agency upon the theory that in that character one link in the system for the suppression of the 'cut rate' business might be regarded as valid," and that under this agreement "the jobber must be regarded as the general owner and engaged in selling for himself and not as a mere agent of another." 164 Fed. Rep. 805.

There are certain allegations in the bill which do not accord with the complainant's argument. Thus it is alleged that it "has been and is the uniform custom" of the complainant "to sell said medicines, remedies and cures to jobbers and wholesale druggists, who in turn sell and dispose of the same to retail druggists for sale and distribution to the ultimate purchaser or consumer." And in setting forth the form of the agreement in question it is alleged that it was "required to be executed by all jobbers and wholesale druggists to whom your orator sold its aforesaid remedies, medicines and cures." It is further stated that as a means of maintaining "said list of prices," cards bearing serial identifying numbers are placed in each package of remedies "sold to jobbers and wholesale druggists." But it is also alleged in the bill that under the provisions

of the contract the title to the medicines remained in the complainant "until actual sale in good faith to retail dealers, as therein provided."

Turning to the agreement itself, we find that it purports to appoint the party with whom it is made one of the complainant's "Wholesale Distributing Agents," and it is agreed that the complainant, as proprietor, shall consign to the agent "for sale for the account of said Proprietor" such goods as it may deem necessary, "the title thereto and property therein to be and remain in the Proprietor absolutely until sold under and in accordance with the provisions hereof, and all unsold goods to be immediately returned to said Proprietor on demand and the cancellation of this agreement." The goods are to be invoiced to the consignee at stated prices, which are the same as the minimum prices at which the consignee is allowed to sell. It is also agreed that the consignee shall "faithfully and promptly account and pay to the Proprietor the proceeds of all sales, after deducting as full compensation . . . a commission of ten per cent of the invoice value, and a further commission of five per cent on the net amount of each consignment, after deducting the said ten per cent commission, on all advances on account remitted within ten days from the date of any consignment," such advances, however, not to affect the title to the goods and to be repaid should the agreement be terminated and unsold goods, on which advances had been made, be returned. The consignee guarantees payment for all goods sold and promises "to render a full account and remit the net proceeds on the first day of each month of and for the sales of the month preceding."

The consignee agrees "to sell only to the designated Retail Agents of said Proprietor as specified in lists of such Retail Agents furnished by said Proprietor and alterable at the will of said Proprietor." A further provision permits sales "only to the said Retail or Wholesale Agents

of said Proprietor, as per list furnished." No time is fixed for the duration of the agreement.

It is urged that the additional commission of five per cent is to induce, through the guise of "advances," payment for the goods before sales are made, and that unsold goods are to be returned only on the complainant's demand and the cancellation of the agreement. But the consignee is not bound to make these "advances" and it is distinctly provided that he shall not acquire title by making them. It is also said that the consignee may sell at prices higher than those listed, but he is bound by the agreement to account for "the proceeds of all sales" less the stipulated commissions. Nor is the provision as to the time for accounting and remittance of net proceeds to be regarded as inconsistent with agency, in the absence of a showing that in the actual transactions and accounts the consignee was treated as selling on his own behalf and paying as purchaser.

If, however, we consider the "consignment contract" as one which in legal effect provides for consignments of goods to be sold by an agent for his principal's account, and that the tenor of the agreement as set forth must be taken to override the inconsistent general allegations to which we have referred, this alone would not be sufficient to support the bill.

The bill charges that the defendant has unlawfully and fraudulently procured the proprietary medicines from the complainant's "wholesale and retail agents" in violation of their contracts. But it does not allege that the goods procured by the defendant from "wholesale agents" were goods consigned to the latter for sale. The description "wholesale agent" refers to those who have signed the "consignment contract." This contract, however, permits one "wholesale agent" to sell to another "wholesale agent." For all that appears, the goods procured by the defendant may have been purchased by the defendant's

vendors from other wholesale agents.    The bill avers that
prior to the introduction of the described system the de-
fendant, a wholesale house, had dealt in the remedies and
had purchased them from the complainant and from
"wholesale druggists and jobbers."    There is nothing in
the bill which is inconsistent with such an actual course of
dealing, permitted by the agreement itself, with respect
to the wholesale dealers who have signed it.    But the
goods which one wholesale agent purchased from another
wholesale agent would not be held for sale as consigned
goods belonging to the complainant and·to be accounted
for as such; and their sale by the wholesale dealer, who had
acquired title, would be made for his own account and
not for that of the complainant.    The allegations of the
bill and the plain purpose of the system of contracts do
not permit the conclusion that it was intended that whole-
sale dealers purchasing goods in this way should be free
to sell to any one at any price.    Evidently it was not con-
templated that the restrictions of the system should be
escaped in such a simple manner.    But if the restrictions
of the "consignment contract," as to prices and vendees,
are to be deemed to apply to the sale of goods which one
wholesale dealer has purchased from another, it is evident
that the validity of the restrictions in this aspect must be
supported on some other ground than that such sale is
made by the wholesale dealer as the agent of the complain-
ant.    The case presented by the bill cannot properly be
regarded as one for inducing breach of trust by an
agent.

    The other form of contract, adopted by the complainant,
while described as a "retail agency contract," is clearly
an agreement looking to sale and not to agency.    The so-
called "retail agents" are not agents at all, either of the
complainant or of its consignees, but are contemplated
purchasers who buy to sell again, that is, retail dealers.
It is agreed that they may purchase the medicines manu-

factured by the complainant at stated prices. There follows this stipulation:

"In consideration whereof said Retail Agent agrees in no case to sell or furnish the said Proprietary Medicines to any person, firm or corporation whatsoever, at less than the full retail price as printed on the packages, without reduction for quantity; and said Retail Agent further agrees not to sell the said Proprietary Medicines at any price to Wholesale or Retail dealers not accredited agents of the Dr. Miles Medical Company."

It will be noticed that the "retail agents" are not forbidden to sell either to wholesale or retail dealers if these are "accredited agents" of the complainant, that is if the dealers have signed either of the two contracts the complainant requires. But the restriction is intended to apply whether the retail dealers have bought the goods from those who held under consignment or from other dealers, wholesale or retail, who had purchased them. And in which way the "retail agents" who supplied the medicines to the defendant, had bought them is not shown.

The bill asserts complainant's "right to maintain and preserve the aforesaid system and method of contracts and sales adopted and established by it." It is, as we have seen, a system of interlocking restrictions by which the complainant seeks to control not merely the prices at which its agents may sell its products, but the prices for all sales by all dealers at wholesale or retail, whether purchasers or subpurchasers, and thus to fix the amount which the consumer shall pay, eliminating all competition. The essential features of such a system are thus described by Mr. Justice Lurton (then Circuit Judge), in the opinion of the Circuit Court of Appeals in the case of *John D. Park & Sons Company* v. *Samuel B. Hartman*, 153 Fed. Rep. 24, 42: "The contracting wholesalers or jobbers covenant that they will sell to no one who does not come with complainant's license to buy, and that they will not sell

below a minimum price dictated by complainant. Next, all competition between retailers is destroyed, for each such retailer can obtain his supply only by signing one of the uniform contracts prepared for retailers, whereby he covenants not to sell to anyone who proposes to sell again unless the buyer is authorized in writing by the complainant, and not to sell at less than a standard price named in the agreement. Thus all room for competition between retailers, who supply the public, is made impossible. If these contracts leave any room at any point of the line for the usual play of competition between the dealers in the product marketed by complainant, it is not discoverable. Thus a combination between the manufacturer, the wholesalers and the retailers to maintain prices and stifle competition has been brought about."

That these agreements restrain trade is obvious. That, having been made, as the bill alleges, with "most of the jobbers and wholesale druggists and a majority of the retail druggists of the country " and having for their purpose the control of the entire trade, they relate directly to interstate as well as intrastate trade, and operate to restrain trade or commerce among the several States, is also clear. *Addyston Pipe & Steel Co.* v. *United States,* 175 U. S. 211; *Bement* v. *National Harrow Co.,* 186 U. S. p. 92; *Montague & Co.* v. *Lowry,* 193 U. S. 38; *Swift & Co.* v. *United States,* 196 U. S. 375.

But it is insisted that the restrictions are not invalid either at common law or under the act of Congress of July 2, 1890, c. 647, 26 Stat. 209, upon the following grounds, which may be taken to embrace the fundamental contentions for the complainant: (1) That the restrictions are valid because they relate to proprietary medicines manufactured under a secret process; and (2) that, apart from this, a manufacturer is entitled to control the prices on all sales of his own products.

*First.* The first inquiry is whether there is any dis-

tinction, with respect to such restrictions as are here presented, between the case of an article manufactured by the owner of a secret process and that of one produced under ordinary conditions. The complainant urges an analogy to rights secured by letters patent. *Bement* v. *National Harrow Company,* 186 U. S. 70. In the case cited, there were licenses for the manufacture and sale of articles covered by letters patent with stipulations as to the prices at which the licensee should sell. The court said, referring to the act of July 2, 1890 (pp. 92, 93): "But that statute clearly does not refer to that kind of restraint of interstate commerce which may arise from reasonable and legal conditions imposed upon the assignee or licensee of a patent by the owner thereof, restricting the terms upon which the article may be used and the price to be demanded therefor. Such a construction of the act we have no doubt was never contemplated by its framers."

But whatever rights the patentee may enjoy are derived from statutory grant under the authority conferred by the Constitution. This grant is based upon public considerations. The purpose of the patent law is to stimulate invention by protecting inventors for a fixed time in the advantages that may be derived from exclusive manufacture, use and sale. As was said by Chief Justice Marshall in *Grant* v. *Raymond,* 6 Pet. 241–243: "It is the reward stipulated for the advantages derived by the public for the exertions of the individual, and is intended as a stimulus to those exertions. . . . The public yields nothing which it has not agreed to yield; it receives all which it has contracted to receive. The full benefit of the discovery, after its enjoyment by the discoverer for fourteen years, is preserved; and for his exclusive enjoyment of it during that time the public faith is pledged. . . . The great object and intention of the act is to secure to the public the advantages to be derived from the discoveries of individuals, and the means it employs are the com-

pensation made to those individuals for the time and labor devoted to these discoveries, by the exclusive right to make, use and sell, the things discovered for a limited time."

The complainant has no statutory grant. So far as appears, there are no letters patent relating to the remedies in question. The complainant has not seen fit to make the disclosure required by the statute and thus to secure the privileges it confers. Its case lies outside the policy of the patent law, and the extent of the right which that law secures is not here involved or determined.

The complainant relies upon the ownership of its secret process and its rights are to be determined accordingly. Any one may use it who fairly, by analysis and experiment, discovers it. But the complainant is entitled to be protected against invasion of its right in the process by fraud or by breach of trust or contract. *Tabor* v. *Hoffman*, 118 N. Y. 36; *Chadwick* v. *Covell*, 151 Massachusetts, 190. The secret process may be the subject of confidential communication and of sale or license to use with restrictions as to territory and prices. *Fowle* v. *Park*, 131 U. S. 88. A similar principle obtains with respect to the confidential communication of quotations collected by a board of trade. *Board of Trade* v. *Christie Grain & Stock Co.*, 198 U. S. 236.

Here, however, the question concerns not the process of manufacture, but the manufactured product, an article of commerce. The complainant has not communicated its process in trust, or under contract, or executed a license for the use of the process with restrictions as to the manufacture and sale by the licensee to whom the communication is made. The complainant has retained its secret which apparently it believes to be undiscoverable. Whether its remedies are sold or unsold, whether the restrictions as to future sales are valid or invalid, the complainant's secret remains intact. That the complainant may rightfully ob-

ject to attempts to discover it by fraudulent means, or to a breach of trust or contract relating to the process, does not require the conclusion that it is entitled to establish restrictions with respect to future sales by those who purchase its manufactured product. It is said that the remedies "embody" the secret. It would be more correct to say that they are manufactured according to the secret process and do not constitute a communication of it. It is also urged that as the process is secret no one else can manufacture the article. But this argument rests on monopoly of production and not on the secrecy of the process or the particular fact that may confer that monopoly. It implies that, if for any reason monopoly of production exists, it carries with it the right to control the entire trade of the produced article and to prevent any competition that otherwise might arise between wholesale and retail dealers. The principle would not be limited to secret processes, but would extend to goods manufactured by any one who secured control of the source of supply of a necessary raw material or ingredient. But, because there is monopoly of production, it certainly cannot be said that there is no public interest in maintaining freedom of trade with respect to future sales after the article has been placed on the market and the producer has parted with his title. Moreover, every manufacturer, before sale, controls the articles he makes. With respect to these, he has the rights of ownership and his dominion does not depend upon whether the process of manufacture is known or unknown, or upon any special advantage he may possess by reason of location, materials or efficiency. The fact that the market may not be supplied with the particular article, unless he produces it, is a practical consequence which does not enlarge his right of property in what he does produce.

If a manufacturer, in the absence of statutory privilege, has the control over the sales of the manufactured article,

for which the complainant here contends, it is not because
the process of manufacture is kept secret.   In this respect,
the maker of so-called proprietary medicines, unpatented,
stands on no different footing from that of other manu-
facturers.   The fact that the article is represented to be
curative in its properties does not justify a restriction of
trade which would be unlawful as to compositions designed
for other purposes.

*Second.* We come, then, to the second question, whether
the complainant, irrespective of the secrecy of its process,
is entitled to maintain the restrictions by virtue of the fact
that they relate to products of its own manufacture.

The basis of the argument appears to be that, as the
manufacturer may make and sell, or not, as he chooses,
he may affix conditions as to the use of the article or as to
the prices at which purchasers may dispose of it.   The
propriety of the restraint is sought to be derived from the
liberty of the producer.

But because a manufacturer is not bound to make or
sell, it does not follow that in case of sales actually made
he may impose upon purchasers every sort of restriction.
Thus a general restraint upon alienation is ordinarily
invalid.   "The right of alienation is one of the essential
incidents of a right of general property in movables, and
restraints upon alienation have been generally regarded
as obnoxious to public policy, which is best subserved by
great freedom of traffic in such things as pass from hand
to hand.   General restraint in the alienation of articles,
things, chattels, except when a very special kind of prop-
erty is involved, such as a slave or an heirloom, have been
generally held void.   'If a man,' says Lord Coke, in Coke
on Littleton, section 360, 'be possessed of a horse or any
other chattel, real or personal, and give his whole interest
or property therein, upon condition that the donee or
vendee shall not alien the same, the same is void, because
his whole interest and property is out of him, so as he hath

no possibility of reverter; and it is against trade and traffic and bargaining and contracting between man and man.'" *Park* v. *Hartman, supra.* See also Gray on Restraints on Alienation, §§ 27, 28.

Nor can the manufacturer by rule and notice, in the absence of contract or statutory right, even though the restriction be known to purchasers, fix prices for future sales. It has been held by this court that no such privilege exists under the copyright statutes, although the owner of the copyright has the sole right to vend copies of the copyrighted production. *Bobbs-Merrill Co.* v. *Straus,* 210 U. S. 339. There the court said (p. 351): "The owner of the copyright in this case did sell copies of the book in quantities and at a price satisfactory to it. It has exercised the right to vend. What the complainant contends for embraces not only the right to sell the copies, but to qualify the title of a future purchaser by the reservation of the right to have the remedies of the statute against an infringer because of the printed notice of its purpose so to do unless the purchaser sells at a price fixed in the notice. To add to the right of exclusive sale the authority to control all future retail sales, by a notice that such sales must be made at a fixed sum, would give a right not included in the terms of the statute, and, in our view, extend its operation, by construction, beyond its meaning, when interpreted with a view to ascertaining the legislative intent in its enactment." It will hardly be contended, with respect to such a matter, that the manufacturer of an article of commerce, not protected by any statutory grant, is in any better case. See *Taddy & Co.* v. *Sterious & Co.* (1904), 1 Ch. 354; *McGruther* v. *Pitcher* (1904), 2 Ch. 306; *Garst* v. *Hall & Lyon Co.*, 179 Massachusetts, 588. Whatever right the manufacturer may have to project his control beyond his own sales must depend, not upon an inherent power incident to production and original ownership, but upon agreement.

With respect to contracts in restraint of trade, the earlier doctrine of the common law has been substantially modified in adaptation to modern conditions. But the public interest is still the first consideration. To sustain the restraint, it must be found to be reasonable both with respect to the public and to the parties and that it is limited to what is fairly necessary, in the circumstances of the particular case, for the protection of the covenantee. Otherwise restraints of trade are void as against public policy. As was said by this court in *Gibbs* v. *Baltimore Gas Co.*, 130 U. S. p. 409, "The decision in *Mitchel* v. *Reynolds*, 1 P. Wms. 181; *S. C.*, Smith's Leading Cases, 407, 7th Eng. ed.; 8th Am. ed. 756, is the foundation of the rule in relation to the invalidity of contracts in restraint of trade; but as it was made under a condition of things, and a state of society, different from those which now prevail, the rule laid down is not regarded as inflexible, and has been considerably modified. Public welfare is first considered, and if it be not involved, and the restraint upon one party is not greater than protection to the other party requires, the contract may be sustained. The question is, whether, under the particular circumstances of the case and the nature of the particular contract involved in it, the contract is, or is not, unreasonable. *Rousillon* v. *Rousillon*, 14 Ch. D. 351; *Leather Cloth Co.* v. *Lorsont*, L. R. 9 Eq. 345."

"The true view at the present time," said Lord Macnaghten in *Nordenfelt* v. *Maxim-Nordenfelt &c. Co.*, 1904, A. C. p. 565, "I think, is this: The public have an interest in every person's carrying on his trade freely: so has the individual. All interference with individual liberty of action in trading, and all restraints of trade of themselves, if there is nothing more, are contrary to public policy, and therefore void. That is the general rule. But there are exceptions: restraints of trade and interference with individual liberty of action may be justified by the special

circumstances of a particular case. It is a sufficient justification, and indeed it is the only justification, if the restriction is reasonable—reasonable, that is, in reference to the interests of the parties concerned and reasonable in reference to the interests of the public, so framed and so guarded as to afford adequate protection to the party in whose favor it is imposed, while at the same time it is in no way injurious to the public."

The present case is not analogous to that of a sale of good will, or of an interest in a business, or of the grant of a right to use a process of manufacture. The complainant has not parted with any interest in its business or instrumentalities of production. It has conferred no right by virtue of which purchasers of its products may compete with it. It retains complete control over the business in which it is engaged, manufacturing what it pleases and fixing such prices for its own sales as it may desire. Nor are we dealing with a single transaction, conceivably unrelated to the public interest. The agreements are designed to maintain prices, after the complainant has parted with the title to the articles, and to prevent competition among those who trade in them.

The bill asserts the importance of a standard retail price and alleges generally that confusion and damage have resulted from sales at less than the prices fixed. But the advantage of established retail prices primarily concerns the dealers. The enlarged profits which would result from adherence to the established rates would go to them and not to the complainant. It is through the inability of the favored dealers to realize these profits, on account of the described competition, that the complainant works out its alleged injury. If there be an advantage to a manufacturer in the maintenance of fixed retail prices, the question remains whether it is one which he is entitled to secure by agreements restricting the freedom of trade on the part of dealers who own what they

sell.  As to this, the complainant can fare no better with
its plan of identical contracts than could the dealers
themselves if they formed a combination and endeavored
to establish the same restrictions, and thus to achieve the
same result, by agreement with each other.  If the im-
mediate advantage they would thus obtain would not be
sufficient to sustain such a direct agreement, the asserted
ulterior benefit to the complainant cannot be regarded
as sufficient to support its system.

But agreements or combinations between dealers, hav-
ing for their sole purpose the destruction of competition
and the fixing of prices, are injurious to the public interest
and void.  They are not saved by the advantages which
the participants expect to derive from the enhanced price
to the consumer.  *People* v. *Sheldon,* 139 N. Y. 251;
*Judd* v. *Harrington,* 139 N. Y. 105; *People* v. *Milk Ex-
change,* 145 N. Y. 267; *United States* v. *Addyston Pipe &
Steel Co.,* 85 Fed. Rep. 271; on app. 175 U. S. 211; *Mon-
tague & Co.* v. *Lowry,* 193 U. S. 38; *Chapin* v. *Brown,* 83
Iowa, 156; *Craft* v. *McConoughy,* 79 Illinois, 346; *W. H.
Hill Co.* v. *Gray & Worcester,* 127 N. W. Rep. (Mich.) 803.

The complainant's plan falls within the principle which
condemns contracts of this class.  It, in effect, creates a
combination for the prohibited purposes.  No distinction
can properly be made by reason of the particular charac-
ter of the commodity in question.  It is not entitled to
special privilege or immunity.  It is an article of commerce
and the rules concerning the freedom of trade must be
held to apply to it.  Nor does the fact that the margin
of freedom is reduced by the control of production make
the protection of what remains, in such a case, a negligible
matter.  And where commodities have passed into the
channels of trade and are owned by dealers, the validity
of agreements to prevent competition and to maintain
prices is not to be determined by the circumstance whether
they were produced by several manufacturers or by one,

or whether they were previously owned by one or by many. The complainant having sold its product at prices satisfactory to itself, the public is entitled to whatever advantage may be derived from competition in the subsequent traffic.

The questions involved were carefully considered and the decisions reviewed by Judge Lurton in delivering the opinion of the Circuit Court of Appeals in *Park* v. *Hartman, supra,* and, in following that case, it was concluded below that the restrictions sought to be enforced by the bill were invalid both at common law and under the act of Congress of July 2, 1890.   We think that the court was right.

The allegations of the bill as to the labels and cartons used by the complainant are evidently incidental to the main charge as to the procurement of violation of the restrictions as to prices and vendees contained in the agreement; and failing as to this no case is made for relief with respect to the trade-marks, which are not shown to have been infringed.

*Judgment affirmed.*

MR. JUSTICE LURTON took no part in the consideration and decision of this case.

MR. JUSTICE HOLMES, dissenting.

This is a bill to restrain the defendant from inducing, by corruption and fraud, agents of the plaintiff and purchasers from it to break their contracts not to sell its goods below a certain price.   There are two contracts concerned. The first is that of the jobber or wholesale agent to whom the plaintiff consigns its goods, and I will say a few words about that, although it is not this branch of the case that induces me to speak.   That they are agents and not buyers I understand to be conceded, and I do not see how it

can be denied. We have nothing before us but the form and the alleged effect of the written instrument, and they both are express that the title to the goods is to remain in the plaintiff until actual sale as permitted by the contract. So far as this contract limits the authority of the agents as agents I do not understand its validity to be disputed. But it is construed also to permit the purchase of medicine by consignees from other consignees, and to make the specification of prices applicable to goods so purchased as well as to goods consigned. Hence when the bill alleges that the defendant has obtained medicine from these agents by inducing them to break their contracts, the allegation does not require proof of breach of trust by an agent, but would be satisfied by proving a breach of promise in respect of goods that the consignee had bought and owned. This reasoning would have been conclusive in the days of Saunders if the construction of the contract is right, as I suppose that it is. But the contract as to goods purchased is at least in the background and obscure; it is not the main undertaking that the instrument is intended to express. I should have thought that the bill ought to be read as charging the defendant with inducing a breach of the ordinary duty of consignees as such (*Swift & Co.* v. *United States*, 196 U. S. 375, 395), and, therefore, as entitling the plaintiff to relief. *Angle* v. *Chicago, St. Paul, Minneapolis & Omaha Ry. Co.*, 151 U. S. 1.

The second contract is that of the retail agents, so called, being really the first purchasers, fixing the price below which they will not sell to the public. There is no attempt to attach a contract or condition to the goods, as in *Bobbs-Merrill Co.* v. *Straus*, 210 U. S. 339, or in any way to restrict dealings with them after they leave the hands of the retail men. The sale to the retailers is made by the plaintiff, and the only question is whether the law forbids a purchaser to contract with his vendor that he will not sell

below a certain price.    This is the important question in this case.    I suppose that in the case of a single object such as a painting or a statue the right of the artist to make such a stipulation hardly would be denied.    In other words, I suppose that the reason why the contract is held bad is that it is part of a scheme embracing other similar contracts each of which applies to a number of similar things, with the object of fixing a general market price. This reason seems to me inadequate in the case before the court.    In the first place by a slight change in the form of the contract the plaintiff can accomplish the result in a way that would be beyond successful attack.    If it should make the retail dealers also agents in law as well as in name and retain the title until the goods left their hands I cannot conceive that even the present enthusiasm for regulating the prices to be charged by other people would deny that the owner was acting within his rights.    It seems to me that this consideration by itself ought to give us pause.

But I go farther.    There is no statute covering the case; there is no body of precedent that by ineluctable logic requires the conclusion to which the court has come.    The conclusion is reached by extending a certain conception of public policy to a new sphere.    On such matters we are in perilous country.    I think that, at least, it is safe to say that the most enlightened judicial policy is to let people manage their own business in their own way, unless the ground for interference is very clear.    What then is the ground upon which we interfere in the present case? Of course, it is not the interest of the producer.    No one, I judge, cares for that.    It hardly can be the interest of subordinate vendors, as there seems to be no particular reason for preferring them to the originator and first vendor of the product.    Perhaps it may be assumed to be the interest of the consumers and the public.    On that point I confess that I am in a minority as to larger issues than

are concerned here.   I think that we greatly exaggerate the value and importance to the public of competition in the production or distribution of an article (here it is only distribution), as fixing a fair price.   What really fixes that is the competition of conflicting desires.   We, none of us, can have as much as we want of all the things that we want.   Therefore, we have to choose.   As soon as the price of something that we want goes above the point at which we are willing to give up other things to have that, we cease to buy it and buy something else.   Of course, I am speaking of things that we can get along without.   There may be necessaries that sooner or later must be dealt with like short rations in a shipwreck, but they are not Dr. Miles's medicines.   With regard to things like the latter it seems to me that the point of most profitable returns marks the equilibrium of social desires and determines the fair price in the only sense in which I can find meaning in those words.   The Dr. Miles Medical Company knows better than we do what will enable it to do the best business.   We must assume its retail price to be reasonable, for it is so alleged and the case is here on demurrer; so I see nothing to warrant my assuming that the public will not be served best by the company being allowed to carry out its plan.   I cannot believe that in the long run the public will profit by this court permitting knaves to cut reasonable prices for some ulterior purpose of their own and thus to impair, if not to destroy, the production and sale of articles which it is assumed to be desirable that the public should be able to get.

The conduct of the defendant falls within a general prohibition of the law.   It is fraudulent and has no merits of its own to recommend it to the favor of the court.   An injunction against a defendant's dealing in non-transferable round-trip reduced rate tickets has been granted to a railroad company upon the general principles of the law protecting contracts, and the demoralization of rates has

been referred to as a special circumstance in addition to the general grounds. *Bitterman* v. *Louisville & Nashville R. R. Co.*, 207 U. S. 205, 222, 223, 224. The general and special considerations equally apply here, and we ought not to disregard them, unless the evil effect of the contract is very plain. The analogy relied upon to establish that evil effect is that of combinations in restraint of trade. I believe that we have some superstitions on that head, as I have said; but those combinations are entered into with intent to exclude others from a business naturally open to them, and we unhappily have become familiar with the methods by which they are carried out. I venture to say that there is no likeness between them and this case. *Jayne* v. *Loder*, 149 Fed. Rep. 21, 27; and I think that my view prevails in England. *Elliman, Sons & Co.* v. *Carrington & Son, Limited* [1901], 2 Ch. 275. See *Garst* v. *Harris*, 177 Massachusetts, 72; *Garst* v. *Charles*, 187 Massachusetts, 144. I think also that the importance of the question and the popularity of what I deem mistaken notions makes it my duty to express my view in this dissent.