UNITY COAT & APRON CO., INC., and Another, Plaintiffs, *v.* MARTIN BATTIST and Others, Defendants.

Supreme Court, Kings County, February 20, 1933.

*Moos, Nathan, Imbrey & Levine* [*Smith, Reiher & Griffin* of counsel], for the plaintiff.

*Nathan Immerman,* for the defendant.

Lockwood, J. The defendant Martin Battist was employed for four years by the plaintiff Unity Company and its predecessor, and the defendant James A. Bagley has been employed by the same company since his return from the war service about twelve years ago. Both Battist and Bagley had employment contracts with the Unity Company. On May 31, 1930, they signed the so-called new contracts which are the subject of this suit. No copies were given them, it being against the practice of the company. These latter contracts of employment which the plaintiff seeks to enforce are

on printed forms naming the plaintiffs Interborough Association, Inc., and Unity Company, Inc., as employers, and Battist and Bagley as employees, and provide among other things that the employee " will not during his employment or after the end thereof, irrespective of the time, manner or cause of its termination, directly or indirectly, disclose to any person, firm or corporation, the name, address or requirements of any of the customers of the companies or either of them, or of any of the various concerns that are members of the Interborough Coat & Apron Supply Association, Inc., and that he will not divulge any other information that he has acquired or that he shall acquire during his period of employment," and " that he will not for a period of five years after the end or termination of his employment  *  *  *  directly or indirectly, either as principal, agent, employee, employer, stockholder, copartner or in any other individual or respresentative capacity whatever, solicit, serve or cater to or engage, assist, be interested in or connected with any other person, firm or corporation, soliciting, serving or catering to any of the customers served by the Unity Coat & Apron Company, Inc., or by any of the concerns who are members of the Interborough Coat & Apron Supply Association, Inc." The contract contains a further covenant by which the employee agrees not to engage in the coat, apron and towel supply business in any capacity whatsoever in Greater New York, Long Island, Westchester or New Jersey, north of Trenton, for a period of five years after the termination of his employment. And " it is expressly agreed that the foregoing negative covenants shall enure to the benefit of the companies, jointly and severally, their successors and assigns, and to the concerns who are members of the Interborough Coat & Apron Supply Association, Inc., and their respective successors and assigns."

From the dates of the new contracts, May 31, 1930, to November 5, 1932, I find Battist and Bagley spent almost their entire time as " trailers." That is, the manager of the Unity would give them the name of an independent, not a member of the Interborough, in the same business. Early the next morning the " trailers " in private automobiles owned by the Unity, but bearing no business lettering, would park near the competitor's place of business and follow the rival's truck all day, making a list of the names, addresses and business of the calls, and at the end of the day turn in the list to the Unity manager. Then other men would usually be sent by the Unity to the competitor's customers to switch them by offering free service of from one to six weeks and lower prices, which prices would be subsequently raised. When the customers became suspicious of the practices of the Unity, a phantom company, the Sterling, was

for a time used by Unity employees, under direction of the Unity manager, to switch business. This Sterling company had the usual printed laundry stationery on which appears the telephone number of the instrument on the desk of the Unity manager. It is admitted that this Sterling company was never incorporated and no certificate of doing business under said name was filed. Battist and Bagley late in October, 1932, trailed delivery autos of a butcher's apron supply company, an independent. The tires of the " trailers " cars were cut, they were threatened with assault, and warned to " keep off the trail " by the rival's employees. This they reported to the Unity manager with the statement that they feared to continue that work. The Unity manager told them it had to be done by some one, and on November 5, 1932, they were discharged without previous notice, verbal or written. Unable to obtain employment in any other line, Battist and Bagley, about November 12, 1932, formed the Allied Coat, Apron & Towel Supply Co., Inc. In a few weeks they had obtained about 150 customers and were reaching a point where the business would be self supporting.

In December, 1932, the plaintiffs brought this action, and on January 3, 1933, secured an injunction *pendente lite* restraining Battist, Bagley and Allied Company from soliciting, serving, catering, or attempting to so do, directly or indirectly, any customers served by the plaintiff Unity Co., *or any of the customers served by any of the concerns who are members of the plaintiff, Interborough Association, Inc.* The injunction also restrains all persons acting for or under said defendants from soliciting, serving or catering to any customers of the Unity Company, or any of the customers of members of the plaintiff, Interborough Association, Inc., and also from directly or indirectly disclosing to anybody the names and addresses of any of the customers of the plaintiff Unity Company, and of any customers of the various concerns who are members of the plaintiff, Interborough Association, Inc., and from divulging any other information that said defendants acquired during the period of their employment by the plaintiffs. The defendants are further enjoined from " in any manner either directly or indirectly, interfering with the trade of any of the customers of the plaintiff Unity Coat & Apron Supply Co., Inc., or any of the customers of said members of the plaintiff Interborough Association, Inc., and from directly or indirectly establishing or maintaining any trade relationships with such persons in competition or interference with the business of the plaintiff Unity Co., Inc., or of any of the said members of the plaintiff Interborough Association, Inc." Then followed an examination before trial of Battist, Mrs. Battist and Bagley and their books and papers and affairs in minute detail. Thus the

Supreme Court, by the great power of injunction and examination, stopped Battist and Bagley, and their company, the Allied Coat, Apron & Towel Supply Company, Inc., into which they had put their savings, the money borrowed from wife and sister, in all $5,000, and long hours of labor, from continuing their business, and Battist and Bagley and their employees are out of work. The Interborough Association, Inc., had its name printed in as a party to the employment contract for the first time in May, 1930. The great importance and effect of bringing in the Interborough was immediately apparent when it was shown that it is a membership corporation — is the trade association of this branch of the industry and through its members controls about ninety per cent of the business in Greater New York and vicinity. The Interborough Association, Inc., however, for some unexplained reason, never signs these employment contracts.

The evidence shows the Interborough uses and finances the Unity to trail the employees of rivals. The Unity Company is the Interborough's utility or stabilizing company. The testimony of the Interborough officials and its records show that it fixes prices, allots customers and fines members, and collects large sums of money from members, part of which is thirty-five dollars per month as dues for each truck operated by each member. It also advances the money, usually cash, to buy out independents. Any man employed by an Interborough member company under one of these contracts for one week or many years can readily be put out of work for five years in the metropolitan district in the line which may be the only one he knows, if temporary injunctions are obtained and made permanent. As to the plaintiff Unity, the contract recites the men were employed as " salesmen." The fact is that from and prior to May 31, 1930, these men were in no sense salesmen, they were " trailers," working under directions of the manager of Unity, who was in daily contact with Interborough, whose proclaimed purposes are as harmless as a garden party, but whose practices seem as harmful as war. A reading of the minutes of the Interborough committee meetings, which are in evidence, is highly illuminating as to the high purposes and destructive practices of this association.

This " trailing " and other unfair trade practices tended to prevent a free pursuit in this State of a lawful business, trade or occupation dealing in an every day necessity and are against public policy. This case must be distinguished from that line of cases in which an injunction is sought against a person who was formerly employed as driver-salesman and who, after terminating his employment, has used for his own purposes the information and contacts with private individuals that he acquired as such an employee and which data

had been built up solely through the diligence, time and money of the employer. Such knowledge of customers' addresses and other data amounts to a trade secret and a court of equity will enjoin such use by persons formerly employed. Here we have a different situation. This is not information gathered from a confidential relationship arising out of the employment of the defendants. There is nothing in the evidence to show that the defendants acquired any lists of plaintiffs' customers. On the contrary, they only obtained lists of independents' customers. The evidence further shows that neither Battist nor Bagley ever attempted to secure the business of a single Unity customer for their own company. Every man, woman, and child knows that barbers, butchers, bakers and grocers use white coats, aprons and towels. The regular, legitimate business has no trade secrets. The customers carry on their business openly, notoriously and publicly, and the names and addresses of such customers are readily obtainable from mere inspection by passersby, from the telephone, red book or public directories. (See *Levy* v. *Cosmos*, 221 App. Div. 533.) Another distinguishing feature is the length of time that the contract states the employees will be prohibited from carrying on a similar line of business. It is five years. In most contracts of this type that the court has granted an injunction against violation, the period has been eighteen months or at most two years. Five years is a wholly unreasonable length of time, and for this reason alone the temporary injunction should be dissolved and the plaintiffs' prayer for relief denied. (*N. Y. Linen Supply & Laundry Co.* v. *Schachter*, 125 Misc. 805; affd., 220 App. Div. 713.) I find from all the evidence that the Interborough Association never signed and executed the alleged contracts, never listed these two men as employees, never paid them, and they never knowingly performed any services for said association. That Battist and Bagley were not employed as salesmen for either Unity or Interborough, but, on the contrary, worked principally as Unity trailers and as canvassers of independents' customers the remainder of the time. That Battist and Bagley never solicited any Unity customers for their Allied Company. That the conduct and practices of these plaintiffs and the provisions of the alleged contracts are so harsh that a court of equity will withhold its discreet and beneficent hand, for to do otherwise would be unjust and produce great privation and hardship. That there was no meeting of the minds of the parties, and that the contracts are of no force and effect.

The temporary injunctions are dissolved and vacated. Judgment is rendered for the defendants against both plaintiffs, with costs. Submit findings and judgment on two days' notice.