PETER F. LYNCH, Plaintiff, *v.* GEORGE D. BAILEY et al., Doing Business under the Name of TOUCHE, NIVEN, BAILEY & SMART, Defendants.

Supreme Court, Special Term, New York County, January 27, 1949.

*D. M. Tibbetts* and *A. V. Cherbonnier* for plaintiff.

*Eustace Seligman, Roy L. Steinheimer, Jr.,* and *William F. Voelker* for defendants.

WALTER, J. Plaintiff and defendants, thirty-five persons in all, were the partners composing three large firms engaged in

practicing public accountancy in a considerable part of the United States, viz., Touche, Niven & Co., George Bailey & Company and Allen R. Smart & Co. By written agreement made August 14, 1947, effective September 1, 1947, they became partners in a new firm, Touche, Niven, Bailey & Smart, which thereupon succeeded to and thereafter carried on the practices of all three firms.

Section 3 of article IX of the partnership agreement provides: " Section 3. Each Partner agrees that in the event that he shall voluntarily withdraw or be required to withdraw pursuant to Article VIII hereof, he will not enter into the practice of the profession of public accountancy (including services as a public accountant with respect to any such matters as auditing, cost accounting, accounting system installation or revision and taxation) within one hundred (100) miles of any city in which any office of the Partnership or of any subordinate, affiliated or associated partnership is located at the time of such withdrawal for a period of four years thereafter, either individually, or as a member of a partnership, or as an employee of any individual, partnership or other entity.''

On October 30, 1947, plaintiff gave notice that he was withdrawing from the partnership effective January 31, 1948, or such earlier date as might be consented to by the firm, and his withdrawal was accepted November 19, 1947. He was informed that the other partners would insist upon and enforce the restrictive covenant above quoted and he brings this action to obtain a judgment declaring the clause void and in any event unenforcible against him, construing the extent to which it prevents him from practicing his profession if valid and applicable at all, and enjoining defendants from taking any action to prevent him from so practicing.

His contentions are (1) that he did not voluntarily withdraw and was not required to withdraw pursuant to article VIII and consequently the clause is not applicable to him, and (2) that the clause is void as being in undue restraint of trade and against public policy.

Plaintiff concededly was not required to withdraw pursuant to article VIII. The applicability of the restrictive covenant to him thus depends upon whether or not he voluntarily withdrew.

By the terms of the partnership agreement the partnership is to continue until terminated by a vote of three quarters in interest of the active partners, and neither the withdrawal or death of a partner nor the admission of any new partner shall

dissolve or terminate the partnership; but any partner may withdraw at the end of any calendar month upon giving three months' prior notice in writing of his intention to do so. Nine of the partners were constituted a policy group, and three were constituted a management committee, and among other important powers the management committee was authorized to award bonuses to partners in recognition of outstanding performance, to change the salary or participation in profits or stated capital of any active partner, and to admit a new partner and determine his participation in capital, his share in profits and losses, and his salary. Defendant Bailey was chairman of the management committee and as such was the chief executive of the partnership. Plaintiff was a member of the policy group but not of the management committee.

Under the participation schedule effective September 1, 1947, when the partnership began, plaintiff's salary was $15,000 per annum, his percentage of the profits was 3.8% and his share of the stated capital was $19,000; defendant Bailey's salary was $18,000, his percentage of the profits was 7.5%, and his share of the stated capital was $37,500; the total capital was $500,000 and the total annual salaries of all the partners was $446,000.

Active partners, of whom plaintiff was one, agreed to devote their entire time, attention and influence to the business and interests of the partnership, and not to engage in any other business except with the approval of the management committee. Advisory partners were not required to devote their entire time to the affairs of the partnership, but it was further provided in section 2 of article IX: " each Active Partner agrees that in the event that he becomes an Advisory Partner he will not enter into the practice of the profession of public accountancy (including services as a public accountant with respect to any such matters as auditing, cost accounting, accounting system installation or revision and taxation) within one hundred (100) miles of any city in which any office of the Partnership or of any subordinate, affiliated or associated partnership is located at the time of such change in status for a period of four years thereafter, either individually, or as a member of any partnership, or as an employee of any individual, partnership or other entity. Each Advisory Partner at the time of the taking effect of this Agreement likewise agrees that during the period of four years from September 1, 1947, he will not enter into the practice of such profession within one hundred (100) miles of any city in which the Partnership or any subordinate, affiliated or associated partnership may have an office."

One of the plans in mind at the time of the formation of the partnership was the opening of an office in Hartford, Connecticut, and later on an office in Boston, Massachusetts, with the object of increasing the firm's business and prestige in New England.

Upon the commencement of the partnership, plaintiff took up his duties in the New York office and was devoting the major part of his time to the work of three clients who had been clients of Allen R. Smart & Co., of which he had been a partner, two of which clients were located in Hartford, Connecticut.

On October 10 or 11, 1947, plaintiff was informed that the management committee had decided that he should go to Hartford and take charge of the office which the firm would open there. Plaintiff objected that it was for the best interest of the firm as well as himself that he remain in New York. He doubtless honestly thought so, although the reasons he gave for thinking so do not convince me that it was so, and I strongly suspect that a more compelling reason with him was a desire to continue to live in New York instead of changing his residence to Hartford. In any event, the management committee was equally honest in thinking that it was best for plaintiff to take over supervision of the proposed Hartford office and to take it over as a resident of Hartford, and I cannot say that in urging that course upon plaintiff they did anything they were not entitled to do.

Plaintiff claims, it is true, that he had laid it down as a condition of his joining the firm that he was to be a resident New York partner, but nothing of that sort appears in the partnership agreement or in any other agreement disclosed in the evidence.

Plaintiff says that defendant Bailey told him he (plaintiff) should consider that he was under orders to go to Hartford, but plaintiff evidently did not consider that in this instance at least " orders is orders " for he admits that Bailey told him to think the matter over for a week and talk with him again about the matter. Bailey undoubtedly intended to impress upon plaintiff's mind that the management committee was very serious about wanting plaintiff to go to Hartford and that it would be a serious thing for plaintiff to refuse to go; and plaintiff undoubtedly was made to understand (principally through the advice and urging of his friend and partner of many years, Jackson W. Smart) that if he refused to go his standing in the firm very likely would be adversely affected, perhaps even to the extent of having his salary and profit participation

reduced, perhaps very substantially. It may be, too, that if plaintiff had talked further to Bailey after giving a week's thought to the proposal that he go to Hartford, he would have been unable to persuade Bailey or the other members of the management committee to change their minds. But the fact remains that plaintiff never did come back to Bailey or any other partner and say that after giving the matter careful and deliberate consideration he had decided that he would withdraw from the firm rather than accede to the proposal that he go to Hartford. Defendants thus never had a chance to determine their course in the light of such an ultimatum from plaintiff; and for all that anyone can now say it may be that if plaintiff had presented them with that ultimatum defendants might have said " Oh well, if you feel that way about it, forget the matter. We still think you should go, but we do not want you to withdraw from the firm and rather than have you do that we will follow along with your idea that New York is the place for you."

Definitions of the words " voluntary " and " involuntary " doubtedless can be found under which it could be said that plaintiff's withdrawal was involuntary because impelled by the presence of a disagreeable alternative; but I think a conclusion of that sort here would be wholly at variance with any sane, sound, logical interpretation of the word " voluntary " as found in the clause of the agreement here in question.

Plaintiff's will was not in any way overcome. He was advised of what his partners (or at least the three on the management committee) thought of the situation, the gist of which was that it was best for him as well as for the firm that he do as the management committee requested, but he was not subjected to any threats or any improper compulsion; and while he reluctantly withdrew, he nevertheless withdrew because he himself elected to do so.

I find and conclude, therefore, that plaintiff voluntarily withdrew from the firm within the meaning of that term as used in section 3 of article IX of the partnership agreement, and that the covenant against the practice of accountancy which is contained in that section is applicable to him.

I think, too, that this is an eminently proper situation for a declaratory judgment if I conclude that the restrictive covenant is valid. A genuine and serious controversy exists. After it arose, the parties endeavored to dispose of it by agreeing upon some concrete formula which would tell plaintiff exactly what he could do without fear of a complaint by defendants that he

was violating the restrictive covenant, and they were unable to construct a formula satisfactory to both sides. Unless an action for a declaratory judgment is entertained, the only way in which the controversy can be judicially determined is by plaintiff's engaging in the practice of accountancy in some way in some place and then defending an action by defendants in which they assert that by such practice he is violating the covenant.

If I should conclude that the restrictive covenant is invalid because contrary to public policy, serious consideration would have to be given to the question whether a person who has received consideration for a covenant will be allowed to come into court and obtain a declaration that it is contrary to public policy. For a discussion of that question, see *Beit* v. *Beit* (135 Conn. 195).

The next question, therefore, is whether the restrictive covenant is valid and enforcible; and I am bound to say that if I had been left to my own resources I would not have thought that even a plausible argument could be constructed in support of plaintiff's view that it is invalid. For I am unable to perceive any reason in law, justice or morals why mature and experienced business men forming a partnership for the practice of public accountancy should not provide in their agreement that one who withdraws from the firm during its existence shall not practice that profession in or near to the places where the firm is practicing it at the time of the withdrawal. And if I had been asked for specific authorities for that view I would have thought that *Diamond Match Co.* v. *Roeber* (106 N. Y. 473), *Hodge* v. *Sloan* (107 N. Y. 244), *Leslie* v. *Lorillard* (110 N. Y. 519, 534), *Tode* v. *Gross* (127 N. Y. 480), *Wood* v. *Whitehead Bros. Co.* (165 N. Y. 545, 550–551) and *McCall Co.* v. *Wright* (198 N. Y. 143, 150–151) were sufficient to settle the point and foreclose discussion.

To my shocked surprise, I find that there are many cases, including some in this State, wherein enforcement of covenants by employees not to compete with former employers have been refused (*Corpin* v. *Wheatley,* 227 App. Div. 212, beauty parlor operator; *Unity Coat & Apron Co.* v. *Battist,* 148 Misc. 411, coat, apron and towel supply business; *Murray* v. *Cooper,* 268 App. Div. 411, affd. 294 N. Y. 658, dancing instructor; *Lantieri Beauty Salon* v. *Yale,* 169 Misc. 547, beauty parlor operator; *Elm Fruit & Vegetable Market* v. *DeFeo,* 238 App. Div. 862; *Oppenheimer* v. *Hirsch,* 5 App. Div. 232, salesman of sausage casings and butchers' supplies and tools; *Samuel Stores, Inc.,* v.

*Abrams,* 94 Conn. 248, clothing store manager; *Super Maid Cook-Ware Corp.* v. *Hamil,* 50 F. 2d 830, dealing in aluminum cookware; *Herreshoff* v. *Bontineau,* 17 R. I. 3, teacher of languages; and see annotation in 9 A. L. R. 1456).

Some of those cases emphasize the absence of any showing that the employee was using any trade secrets or other confidential information obtained while in the plaintiff's employ or that his services were unique or extraordinary, thus betraying, as it seems to me, a lamentable failure to recognize the difference between protecting an employer from competition by a former employee who has not covenanted not to compete and enforcing an express covenant not to compete. Some of those cases talk about whether or not the scope of the covenant not to compete was reasonable, as if courts were endowed with power to sit in judgment upon the reasonableness of contracts, a notion which is abhorrent to me. Sometimes the reference has been to public policy as a reason for refusing to enforce the covenant, whereas it seems to me that the highest and best public policy is that, within the limits of a legitimate object and uncoerced agreement (the essentials of any valid contract), people should be allowed to make such contracts as they please with complete confidence that they will be enforced as made (Cf. 5 Williston on Contracts [Rev. ed.], § 1629A). Sometimes it has been suggested that perhaps the employee had to " sign on the dotted line ", but the answer to that seems to me to be that if in fact any particular contract was obtained by duress the decision should have been that there was in reality no contract, and not that the courts will refuse to enforce a contract or some particular provision thereof. Yet, a reading of many cases of the kind last above referred to gives a strong suspicion that the real but unavowed reason for the decision in most of them was nothing other than a notion that it is inequitable to hold an employee to a covenant not to compete.

*Kaumagraph Co.* v. *Stampagraph Co.* (235 N. Y. 1) and *Clark Paper & Mfg. Co.* v. *Stenacher* (236 N. Y. 312) have been rather frequently referred to as holding that covenants by employees not to compete with former employers will not be enforced. The opinions therein undoubtedly contain language which looks in that direction, but I do not think the cases actually so hold. In the later of them the court expressly held that the claimed contract actually never had been made and for that reason plaintiff was not entitled to judgment (p. 317). I do not go so far as to say that all the remainder of the opinion in that case is mere dicta, because a court may base its decision upon

two grounds if it so desire; but it certainly would be anomalous to say that the unenforcibility of covenants by employees not to compete with former employers is established by the dismissal of the complaint in an action where there was no such covenant. Prior to *Interstate Tea Co.* v. *Alt* (271 N. Y. 76) I would not have been presumptuous enough to say that the statements in 235 New York 1, 9, were palpably unfounded; but the fact remains that when in the later case of *Interstate Tea Co.* v. *Alt* (245 App. Div. 818) the Appellate Division, Second Department, took them at face value, its judgment was reversed (271 N. Y. 76).

Again in the later case of *Foster* v. *White* (273 N. Y. 596) the court sustained the legal sufficiency of a complaint which sought to enjoin a physician from practicing his profession in violation of a covenant not to compete with plaintiffs, his former employers.

Other cases in which covenants by employees not to compete with former employers have been enforced are *Ward Baking Co.* v. *Tolley* (248 N. Y. 603), *Magnolia Metal Co.* v. *Price* (65 App. Div. 276), *Eastman Kodak Co.* v. *Powers Film Products* (189 App. Div. 556), *Barnard Bakeshops* v. *Dirig* (173 Misc. 862), *Holland Furnace Co.* v. *Beers* (177 Misc. 29), *Steinfeld* v. *Hausen* (180 Misc. 295), *Wilkinson Bros. & Co.* v. *Ebbets* (103 Misc. 324), *Elbe File & Binder Co.* v. *Fine* (137 Misc. 255) and *Schmidl* v. *Central Laundry & Supply Co.* (13 N. Y. S. 2d 817).

Just where all that leaves the present state of New York law upon the subject of covenants by employees not to compete with former employers I do not undertake to formulate because in my opinion that is not necessary to a decision of this case. This is not an employer-employee case.

The authorities generally agree, and many insist, that there is a distinction between a covenant which is ancillary to the sale of a business and one which is ancillary to a contract of employment, and although plaintiff argues that the situation here is analogous to a contract of employment I think the true analogy is to the sale of a business. The partners in the constituent firms of whom plaintiff was one, in effect transferred their businesses and good will to the new firm of Touche, Niven, Bailey & Smart, and all the considerations which make it reasonable and proper for the vendor of a business to agree not to compete with the vendee seem to me to be present here in full force.

The authorities are in substantial agreement that covenants not to compete which are incidental or ancillary to a sale of a business are valid. The single discordant note on that point

which has come to my attention is *Beit* v. *Beit* (135 Conn. 195, *supra*).

The cases in which such covenants have been sustained are too numerous even to cite, and, in addition to the New York Court of Appeals cases to which I referred at the outset of the discussion as to legality I will refer only to some partnership cases (*Marvel* v. *Jonah*, 83 N. J. Eq. 295; *Storer* v. *Brock*, 351 Ill. 643; *Decker* v. *West*, 273 Ill. App. 532; *Shaleen* v. *Stratte*, 188 Minn. 219; *Cole* v. *Edwards*, 93 Iowa 477; *Mills* v. *Cleveland*, 87 Kan. 549; 5 Williston on Contracts [Rev. ed.], § 1644).

Professor Williston says (5 Williston on Contracts [Rev. ed.], § 1636) that it is everywhere agreed that in order to be valid a promise imposing a restraint in trade or occupation must be reasonable. But he immediately adds that the question of reasonableness is for the court, not the jury; and I take the meaning to be that the court is to inquire, not whether in any particular case the parties made a good or bad bargain, but whether the public interest in reality would be adversely affected by an enforcement of the contract.

Reasonableness in that sense is mentioned also in *Dr. Miles Medical Co.* v. *Park & Sons Co.* (220 U. S. 373, 406) where it was said: '' With respect to contracts in restraint of trade, the earlier doctrine of the common law has been substantially modified in adaptation to modern conditions. But the public interest is still the first consideration. To sustain the restraint, it must be found to be reasonable both with respect to the public and to the parties and that it is limited to what is fairly necessary, in the circumstances of the particular case, for the protection of the covenantee. Otherwise restraints of trade are void as against public policy. As was said by this court in *Gibbs* v. *Baltimore Gas Co.*, 130 U. S. p. 409, ' The decision in *Mitchel* v. *Reynolds*, 1 P. Wms. 181; *S. C.*, Smith's Leading Cases, 407, 7th Eng. ed.; 8th Am. ed. 756, is the foundation of the rule in relation to the invalidity of contracts in restraint of trade; but as it was made under a condition of things, and a state of society, different from those which now prevail, the rule laid down is not regarded as inflexible, and has been considerably modified. Public welfare is first considered, and if it be not involved, and the restraint upon one party is not greater than protection to the other party requires, the contract may be sustained. The question is, whether, under the particular circumstances of the case and the nature of the particular contract involved in it, the contract is, or is not, unreasonable. *Rousillon* v. *Rousillon*, 14 Ch. D. 351; *Leather Cloth Co.* v. *Lorsont*, L. R. 9 Eq. 345.' ''

Restatement of the Law of Contracts (§ 514) likewise lays down the broad proposition that a bargain in restraint of trade is illegal if the restraint is unreasonable, but the subsequent statements in and comments under section 515 and section 516 demonstrate, I think, that the court which has to determine legality is to determine reasonableness, not from the standpoint of whether the party against whom enforcement is sought gave up too much in comparison with what he got, but from the standpoint of whether the public interest would be adversely affected by an enforcement of the covenant.

From that standpoint, therefore, and from that standpoint only, I turn to a consideration of the reasonableness of the covenant in this case.

At the time plaintiff withdrew from the firm it had offices in New York, Pittsburgh, Cleveland, Detroit, Chicago, Dayton, Minneapolis, St. Louis, Seattle, and Los Angeles; and a glance at a map having 100-mile radii circles drawn around those places will show that the effect of the covenant is to prevent plaintiff from practicing accountancy in a very large portion of northeastern United States, a considerable part of the State of Washington, and a small part of the State of California. But the covenant has no operation in a total of thirty-two States which take in the whole of the South, Southwest, and Middle West, substantially all the far west, and much of New England and the Atlantic seaboard. It does not exclude plaintiff from Boston, Baltimore, Washington, D. C., Portland or San Francisco, or a host of other smaller cities. The covenant is thus far more limited in space than the covenant which was sustained in *Diamond Match Co.* v. *Roeber* (106 N. Y. 473, *supra*). It also is far more limited in time, for there the covenant was for ninety-nine years (and thus practically for the life of the covenantor), whereas here the covenant is for only four years.

There is, of course, no suggestion that enforcement of the covenant would tend to promote a monopoly or deprive the public of an opportunity to obtain adequate accounting services on a highly competitive basis; and I cannot doubt that the covenant is entirely reasonable and entirely lawful. I perceive no way in which the public interest could be harmed by enforcing it, and while it of course bears somewhat heavily upon plaintiff it does not entirely prevent him from practicing the profession to which he has devoted the most of his life and does not at all interfere with his following other vocations which, although perhaps not as pleasing or remunerative to him, are yet within his capacities and opportunities.

Plaintiff's counsel has made a special point that California and Michigan have statutes under which, as he claims, this covenant is invalid. He suggests, as I understand him, that defendant Bailey lives in Michigan and the covenant thus might be unenforcible as to him and thus there is destroyed the mutuality requisite for specific performance of a contract. I perceive no substance to that contention. There is no evidence that the contract was in fact entered into outside of New York, and it contains the express provision that it shall be deemed to be executed in New York, regardless of the domiciles of the parties and shall be governed in accordance with the laws of New York. A situation might arise, of course, under which someone might seek to enforce the contract in some State which would refuse to enforce it, but that possibility cannot of itself either destroy the validity of the contract under New York law or render it lacking in mutuality.

I assume that a New York court undertaking to render a declaratory judgment with respect to the validity of a contract necessarily must be deemed to have limited its declaration to a declaration of its validity under New York law, and if it be valid under New York law I see no reason why that declaration may not be made even though the contract may be invalid under the law of some other State.

I note further, however, that the Michigan statute upon which plaintiff relies apparently does not sustain his claim that Michigan would regard the clause here in question as invalid or would refuse to enforce it. That statute (Mich. Compiled Laws, 1929, §§ 16661, 16667, 16672; 24 Mich. Stats. Ann., §§ 28.51, 28.61, 28.66) provides that contracts by which a person agrees not to engage in any trade, profession, or business, whether reasonable or unreasonable, partial or general, limited or unlimited, are against public policy and illegal and void; but that the statute shall not apply where the only object is to protect the vendee or transferee of a trade, profession or business, or the good will thereof, sold and transferred for a valuable consideration in good faith.

And in *Wolverine Sign Works* v. *Powers* (248 Mich. 371) the Supreme Court of Michigan, despite that statute, held valid and enforcible a contract by which the seller of a business of manufacturing and renting bulletin boards agreed, as part consideration, that he would never engage in outdoor advertising in a designated territory, even though the territory so designated extended beyond that in which such seller had been doing business.

*Weickgenant* v. *Eccles* (173 Mich. 695) and *Gasses* v. *Razk* (219 Mich. 500) are further indications that Michigan would not refuse to enforce the contract here involved.

The California statute which plaintiff invokes (Deering's Cal. Codes — Business and Professions — §§ 16600, 16601) likewise provides that any person who sells the good will of a business may agree with the buyer to refrain from carrying on a similar business within a specified county, or counties, city or cities, or a part thereof, in which the business so sold has been carried on, so long as the buyer, or any person deriving title to the good will from him, carries on a like business therein. I thus see no reason for supposing that California would refuse to enforce the covenant here involved.

Another special point raised upon the trial is whether or not Hartford, Conn., is within the area of the restrictive covenant, i.e., whether or not it is within 100 miles of New York; for, ironically enough, plaintiff, after having withdrawn from the firm because he did not want to go to Hartford, apparently now has developed the idea that that is where he wants to practice.

According to the schedule of the New York, New Haven & Hartford Railroad Co., Hartford is 108 miles from New York. According to a Civil Airways and Mileage Chart of the U. S. Coast and Geodetic Survey, it is only 88 miles from New York or 94 by way of Bridgeport, Conn. According to an automobile road map issued by Standard Oil Co., it is 99 miles from the north end of Manhattan Island to the center of Hartford. Despite the now rather widespread use of both automobiles and airplanes as modes of travel, I think it still more reasonable to adopt the railroad schedule as the most practical and the one more likely to have been in the minds of the parties; and I accordingly hold that Hartford is outside the restricted area.

Still another special point raised by plaintiff is that the nature and course of the practice of accountancy are such that in practical effect the contract prevents him from engaging in such practice in many places outside the area specified in the contract and actually contemplated by the parties. Specifically and by way of illustration he says that although legally entitled to practice in Kansas City because that place is more than 100 miles from St. Louis, no accounting firm having offices in Kansas City would take him in as a partner or high salaried employee because to be of value to such firm he necessarily would have to go to St. Louis from time to time to consult with officers of clients of the firm or their bankers or lawyers. The evidence does not per-

suade me that that is true except in some instances and to a much more limited extent than plaintiff claims; but apart from that I am of the opinion that if plaintiff were genuinely and in good faith practicing in Kansas City, or any other place outside the restricted area, and genuinely and in good faith maintaining his office and residence outside the restricted area, the mere fact that such practice would require him upon occasion to go into the restricted area in order to consult with bona fide clients or their bankers or lawyers would not constitute practice within the restricted area and would not violate the contract. Of course, if plaintiff should use those occasional trips into the restricted area as a means or opportunity of endeavoring to get new clients in the restricted area, that, I think, plainly would constitute a violation.

I conclude, therefore, that there should be judgment declaring and adjudging (1) that the covenant is applicable to plaintiff and is valid and enforcible, (2) that Hartford, Conn., is outside the area in which plaintiff has agreed not to practice, (3) that if plaintiff, individually or as an employee or partner of an accounting firm, should genuinely and in good faith maintain an office for the practice of accountancy at a place outside the area in which he has agreed not to practice, and should practice accountancy at that office while genuinely and in good faith maintaining his residence outside such area, he would not violate his contract by occasionally going into the restricted area and there consulting with officers, lawyers or bankers of clients being served at such office when such consultation is reasonably necessary or appropriate for the proper performance of any accountancy service which such clients require or desire; but it would be a violation of his contract for defendant to use such trips into the restricted area as a means or opportunity of endeavoring to get new clients in the restricted area.

I direct the entry of judgment accordingly, without costs.

The foregoing constitutes the decision required by the Civil Practice Act, and judgment is to be entered thereon.