**UNITED STATES of America,**
**Plaintiff,**

v.

**GENERAL MOTORS CORPORATION, Losor Chevrolet Dealers Association, Dealers' Service, Inc., Foothill Chevrolet Dealers Association, Kenneth E. Staley, Lee N. Mays, Roy M. Cash, and Robert M. O'Connor, Defendants.**

No. 30,132–Cr.

United States District Court
S. D. California,
Central Division.

March 14, 1963.

Maxwell M. Blecher, Antitrust Division, Dept. of Justice, Los Angeles, Cal., Les J. Weinstein, Robert C. Weinbaum and Paul A. Owens, Antitrust Division, Dept. of Justice, Washington, D. C., for plaintiff.

O'Melveny & Myers, Homer I. Mitchell, Henry C. Thumann, Donald M. Wessling, Lawler, Felix & Hall, Marcus Mattson, J. Phillip Nevins, Los Angeles, Cal., Aloysius F. Power, Robert A. Nitschke, and Nicholas J. Rosiello, Detroit, Mich., for defendants General Motors Corp., Kenneth E. Staley, Lee N. Mays, Roy M. Cash and Robert M. O'Connor.

Hansen & Dolle, Victor R. Hansen, Robert W. Culver, and Glenn S. Roberts, Los Angeles, Cal., for defendants Losor Chevrolet Dealers Assn., Dealers' Service, Inc., and Foothill Chevrolet Dealers Assn.

THURMOND CLARKE, District Judge.

This case began one and one-half years ago when the Grand Jury returned a two-count indictment charging defendants with violations of the antitrust laws. The second count was dismissed by order of this court, dated January 17, 1962. On November 20th of last year, this trial began. Now, almost four months later, there are before us over 600 exhibits and over 6,000 pages of recorded testimony. The Government has rested its case and the defense has moved for judgment of acquittal.

The defendants in this criminal proceeding are General Motors Corporation, three associations of Chevrolet dealers (Losor, Foothill and Dealers' Service, Inc.) and four individuals (Staley, Mays, Cash and O'Connor) who are officials of General Motors Corporation. They are charged in Count One, the only remaining Count of the indictment, with violation of Section 1 of the Sherman Act. Specifically, defendants are charged with having conspired to suppress sales of Chevrolet automobiles by Chevrolet dealers through discount houses and referral services by inducing the dealers to terminate selling agreements with the discount houses and referral services. Also in Count One, defendants are charged with having utilized "shoppers" in order to discover dealers who were selling through discount houses or referral services and with having induced such deal-ers to repurchase Chevrolets sold by them to "shoppers."

That defendants did engage in the activity charged is not in dispute. In dispute is the question of whether the activity with which the defendants are charged amounted to an unreasonable restraint of trade. If the agreement to persuade dealers to refrain from selling Chevrolet automobiles through discount houses and referral services was a reasonable restraint of trade, there has been no violation of Section 1 of the Sherman Act. Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1910).

By deciding to prosecute these defendants under criminal law, the Government has accepted a difficult burden of proof. For conviction, the Government had to produce evidence that the defendants were guilty beyond a reasonable doubt. In order to get its case to a jury and thereby escape a judgment of acquittal, the Government had to produce evidence which, taken in the light most favorable to the Government, could convince a reasonable juror that the defendants were guilty as charged beyond a reasonable doubt. Curley v. United States, 81 U.S.App.D.C. 389, 160 F.2d 229 (1947). The Government has failed to sustain this burden.

The Government has attempted to pin the label of "boycott" onto the activity described in Count One of the indictment. A boycott is a per se violation of the antitrust laws for which there can be no justification. It consists of a "concerted refusal to deal." Klor's, Inc. v. Broadway-Hale Stores, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). The Government's argument is not well taken for the reasons stated in Boro Hall Corporation v. General Motors Corporation, 37 F.Supp. 999 (S.D.N.Y.1941); 124 F.2d 822 (2d Cir., 1942); rehearing denied 130 F.2d 196 (2d Cir., 1942); cert. den. 317 U.S. 695, 63 S.Ct. 436, 87 L.Ed. 556 (1943).

The Government has attempted to show that the decision of the dealers

to terminate their relations with the discount houses was the result of irresistible economic pressure exerted by defendants. There is no evidence in the record that could convince a reasonable juror beyond a reasonable doubt that ecomonic pressure and not self-interest precipitated the decision of the dealers. Indeed, termination of discount house operations was encumbent upon the dealers, under the provision of the franchise contract which prohibits a dealer from establishing a second location, without the consent of General Motors. That the defendants did not stress the contractual clause at every opportunity does not mean that defendants put little stock in it. On the contrary, the record is replete with testimony that General Motors, through its officials, tries to reason and confer with its dealers as partners and not as antagonists. Similarly, there is nothing to show that the Dealers Associations did any more than to try to point out what was thought to be in the best interests of the dealers.

 The shopping activity and the repurchase of the Chevrolets by the dealers who sold to the shoppers was perfectly legitimate activity and is justified under the doctrine of Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961).

 Finally, no reasonable juror could find beyond a reasonable doubt that termination of sales through discount houses unreasonably lessened and restrained competition. The record shows that dealers do compete in their pricing of new cars. The record further discloses that General Motors Corporation reasonably believes that franchise dealers are better representatives of the Corporation than discount houses for the reason that discount houses and referral services have no special or continuing interest in the well being of General Motors, offer no service facilities, and operate entirely free of any control by General Motors.

In conclusion, the court wishes to add a few general remarks. The Government has argued that this criminal prosecution in no way represents an attack on the franchised dealer method of selling automobiles. I cannot agree.

 In applying the antitrust laws, it seems to me that a balance must be struck. The interest of the consumer in a freely competitive market must be protected. But, at the same time, industry has rights which also must be respected. In part, business has, or should have, the right to merchandise a product in a manner that the particular manufacturer determines to be the most feasible and the most competitive. Indeed, I believe that the best way to further the interest of the consumer is to allow business, large and small, to avail itself of the free enterprise system with as little Government interference as possible. This court feels, therefore, that its decision protects both the interests of the public and the interests of business.

Mr. Mitchell, in his argument two days ago, quoted Justice Holmes, a great jurist whose ideas were often first spoken in dissent before finally gaining ascendancy in the policy and law of this nation. Mr. Mitchell was referring to Justice Holmes's dissenting opinion in Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, at page 411, 31 S.Ct. 376, at page 386, 55 L.Ed. 502 where Justice Holmes said: "I think that, at least, it is safe to say that the most enlightened judicial policy is to let people manage their own business in their own way, unless the ground for interference is very clear." This seems a wise policy that might profitably be applied to the instant case.

In the instant case, General Motors, the manufacturer, has chosen the franchised dealership as the outlet best suited to the merchandising of Chevrolet automobiles. General Motors has made the further decision that discount houses and referral services are not the kinds of outlets for Chevrolet automobiles that will keep Chevrolet a leader in sales. At present, the discount operation does not fit the bill because (1) the discount store does not offer service facilities; (2) the discount store is not run by men whom

General Motors has handpicked as its representatives on the retail sales level; and (3) the discount store's automobile department is not run, as is a dealership, by a man having a large investment in his business who has a long range view and will endeavor to maintain the public's confidence in, and good-will toward, Chevrolet. In its broader aspects, the case presents this question: Despite the decision of General Motors, should the Government, through the antitrust laws, compel General Motors to adopt the discount houses and, with them, a method of merchandising not of General Motors' choosing? The court thinks not.

The free enterprise system is a basic part of the American way of life. Justice Holmes's suggestion "to let people manage their own business in their own way, unless the ground for interference is very clear" is good advice. If the advice is heeded both by the courts and by government, I am confident that the United States will continue to be free, strong and prosperous.

For the foregoing reasons, defendants' proposed judgment of acquittal, as set forth below, is hereby adopted by the court.

## JUDGMENT OF ACQUITTAL

The above entitled matter having come on for trial before The Honorable Thurmond Clarke, Judge Presiding, upon Count One of the Indictment (Count Two having been dismissed by the Court prior to trial), the Government and defendants being represented by their respective attorneys of record, and the evidence on the part of the Government having been closed, and defendants having moved for a judgment of acquittal under Rule 29(a) of the Federal Rules of Criminal Procedure, and the Court being fully advised in the premises, concludes as follows:

1. Count One of the Indictment (hereinafter referred to as the Indictment) alleges that pursuant to agreements or understandings with some Chevrolet dealers in the Southern California Area, discount and referral houses performed many merchandising functions in the retail sale of such Chevrolet dealers' Chevrolets to consumers, including referral of customers to such dealers, negotiating terms and conditions of sales of such dealers' Chevrolets to consumers and appraising and purchasing trade-in cars. Thus, the Indictment charges that sales of Chevrolets were made by some dealers *through* discount or referral houses pursuant to agreements or understandings with such houses for the performance of merchandising functions by such houses in the sale of such dealers' Chevrolets. The Indictment does not concern sales by Chevrolet dealers *to* discount or referral houses for resale and there was no evidence that any such sales *to* discount or referral houses were made.

The Indictment further alleges that beginning in the summer of 1960 and continuing to the date of the return of the Indictment (October 12, 1961) the defendants and co-conspirators, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), engaged in a combination and conspiracy in unreasonable restraint of trade and commerce to induce and persuade Chevrolet dealers to cease sales of Chevrolets in the Southern California Area pursuant to such agreements or understandings with discount or referral houses and to suppress and restrain such sales.

2. By stipulation, the evidence shows: During the period of the offense charged in the Indictment, the Chevrolet Motor Division of General Motors Corporation caused Chevrolets to be marketed in the Southern California Area by dealers under a plan of marketing evidenced by and embodied in written Dealer Selling Agreements between the Chevrolet Motor Division and each of its dealers in such area. These Dealer Selling Agreements are identical in form; each assigns to the dealer an area of primary sales responsibility but leaves the dealer free to sell Chevrolets at any price to anyone wherever he may live, work, or have a place of business; each requires the dealer to establish a place of business at a location or locations approved by the Chevrolet Motor Division; and each re-

quires the dealer to refrain from establishing another place of business or branch sales office at any other location without the approval of the Chevrolet Motor Division. In the Los Angeles Metropolitan Area each dealer's area of primary responsibility is the entire Metropolitan Area and the Metropolitan Area Addendum to the Dealer Selling Agreement, applicable to each Chevrolet dealer in the Los Angeles Metropolitan Area, provides in writing that the Chevrolet Motor Division will not increase the number of dealers or change the location of any dealer's place of business without 60 days notice to each dealer in the Metropolitan Area and an opportunity to be heard.

 3. The Dealer Selling Agreements are in writing and it is therefore the duty of the Court to determine the meaning and effect of these agreements. In determining the meaning and effect of these agreements, it is the duty of the Court to give effect to their spirit and purpose as determined from all of the provisions of the agreements. Since these agreements require the dealers to refrain from the establishment of additional places of business or branch sales offices without approval of the Chevrolet Motor Division, these agreements prohibit dealers from establishing, without approval of the Chevrolet Motor Division, the equivalent of additional places of business or branch sales offices and from accomplishing by indirection or subterfuge the establishment of additional places of business or branch sales offices. For a dealer to arrange with a discount or referral house operating a place of business at a location not approved by the Chevrolet Motor Division to have such discount or referral house perform merchandising functions in the sale of such dealer's Chevrolets including engaging in the business of referring customers to such dealers, negotiating terms and conditions of sales of such dealers' Chevrolets to consumers and appraising and purchasing trade-in cars on such sales is just another way whereby the dealer provided for himself what was in substance and effect an additional and unauthorized place of business or branch office without approval of the Chevrolet Motor Division.

██ 4. Having regard to substance rather than to form, the Dealer Selling Agreements require Chevrolet dealers to refrain from having or performing agreements or understandings with discount or referral houses having places of business at locations not approved by the Chevrolet Motor Division whereby such houses engage in the business of referring customers to such dealers with such dealers negotiating the terms of sale with the customer, or whereby such houses negotiate the terms of sale of the Chevrolet with the customer and whereby such dealers, upon instructions from such houses, register title to the Chevrolet in the name of the customer. Under either such form of transaction, and under any combination thereof, the agreement or understanding is one in which the dealer uses discount or referral houses operating places of business at locations other than the dealer's approved location, to perform merchandising services for him in the sale of his Chevrolets. Such agreements and understandings and their performance are in violation of the Dealer Selling Agreements.

5. By stipulation, the evidence also shows: Each Dealer Selling Agreement provides that the agreement is made in reliance upon the personal qualifications and business ability of the persons who own and operate the organization designated as the "Dealer"; that the "Dealer" shall perform the operating requirements of the agreement including the sale of Chevrolets, pursuant to the selling privilege granted to the "Dealer," in a manner which will preserve the good will of Chevrolet products; and that the "Dealer" shall not, without consent of the Chevrolet Motor Division, transfer to others (such as discount or referral houses) the "Dealer's" obligation to perform the operating requirements of the agreement including the requirement to sell the Chevrolet products in accord-

ance with the selling privilege granted to the "Dealer."

6. The Dealer Selling Agreements, properly construed, prohibit Chevrolet dealers from having or performing agreements or understandings with discount or referral houses whereby such dealers have such discount or referral houses perform merchandising functions in the sale of such dealers' Chevrolets including engaging in the business of referring customers to such dealers, negotiating terms and conditions of sales of such dealers' Chevrolets to consumers and appraising and purchasing trade-in cars on such sales.

7. Under the Chevrolet marketing plan as evidenced by and embodied in the Dealer Selling Agreements, a dealer has the right to sell Chevrolets at any price to anyone wherever he may work, live, or have a place of business. Under such agreements, a Chevrolet dealer is not guaranteed or granted any markets, territories or customers nor is he denied or excluded from any markets, territories or customers; there is neither territory security nor territory exclusivity nor customer exclusivity.

8. Section 1 of the Sherman Act prohibits contracts, combinations and conspiracies in unreasonable restraint of competition in interstate commerce. As pointed out by Mr. Justice Brandeis, in Chicago Board of Trade v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 62 L. Ed. 683, decided in 1918, every agreement concerning trade restrains but not every agreement that restrains is violative of the Sherman Act. In White Motor Company v. United States, 83 S.Ct. 696, the Supreme Court reaffirmed Mr. Justice Brandeis' statement in that case as the accepted test for determining the reasonableness of a restraint of competition:

"The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts."

9. The words "in unreasonable restraint of competition" are a statutory phrase, as judicially interpreted, and it is the duty of this Court to determine the meaning of such statutory phrase as applicable in this case to the type of relevant facts which the Chicago Board of Trade case described. United States v. American Trucking Associations, 310 U.S. 534 544, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940).

The restraints herein were contractual restrictions contained in the Dealer Selling Agreements and described in paragraphs 2, 3, 4, 5 and 6 hereof. These paragraphs imposed two limited restrictions on the sale of Chevrolets by Chevrolet dealers: (1) The requirement that the dealer not directly or indirectly establish unauthorized locations; and (2) the requirement that the dealer's sales of Chevrolets be made by the dealer (and not someone else) in a manner that will promote rather than injure the good will of Chevrolet and its products. The uncontradicted evidence shows that these limited restrictions were developed and adopted as a part of a marketing plan which recognizing the special nature of the product, was designed to and did preserve the good will of Chevrolet, provide adequate sales and service facilities and promote competition by Chevrolet dealers with dealers in other makes of automobiles and by Chevrolet dealers among each other; that these restrictions, in view of the rights of the dealers described in paragraph 7 hereof, are reasonable; that they do not constitute an unreasonable restraint of competition; that they do not violate Section 1 of the Sherman Act.

A location limitation substantially identical to the location limitation provisions of the Dealer Selling Agreements was held valid in 1942 by the Court of Appeals for the Second Circuit in a decision written by Judge Augustus N. Hand. The Supreme Court denied certiorari. There is no decision to the contrary. Boro Hall Corporation v. General Motors Corporation, 2 Cir., 124 F.2d 822, 824; rehearing den. 2 Cir., 130 F.2d 196, 197, cert. den. 317 U.S. 695, 63 S.Ct. 436, 87 L.Ed. 556 (1943).

 10. Defendants General Motors Corporation and its officials, Kenneth E. Staley, Lewell N. Mays, Roy M. Cash and Robert M. O'Connor, and each of them, had the right to endeavor to preserve and protect the Chevrolet plan of marketing and to endeavor to induce and persuade Chevrolet dealers to cease conduct which was violative of the Dealer Selling Agreements and in particular to cease making and performing arrangements with discount or referral houses whereby such houses, in places of business at locations not approved by the Chevrolet Motor Division, performed merchandising functions in the sale of such dealers' Chevrolets including engaging in the business of referring customers to such dealers; negotiating terms and conditions of sales of such dealers' Chevrolets to consumers and appraising and purchasing trade-in cars on such sales.

11. Defendants General Motors Corporation, Kenneth E. Staley, Lewell N. Mays, Roy M. Cash and Robert M. O'Connor were not precluded from exercising the rights described in paragraph 10 hereof by the fact that Chevrolet dealers and salesmen, whether acting individually or on behalf of the defendant dealer associations, requested that said defendants act to comply with the intent and purpose of the Dealer Selling Agreements and thus to preserve and protect the Chevrolet plan of marketing.

12. Defendants General Motors Corporation, Kenneth E. Staley, Lewell N. Mays, Roy M. Cash and Robert M. O'Connor had the right by shopping or by accepting shopping information from dealers and defendant dealers associations, to ascertain which dealers were selling Chevrolets in violation of the Dealer Selling Agreements and to request that such dealers undo their violations by repurchasing shopped Chevrolets sold in violation of said agreements.

13. Defendants General Motors Corporation, Kenneth E. Staley, Lewell N. Mays, Roy M. Cash and Robert M. O'Connor did not engage in any combination or conspiracy in unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act.

 14. The Dealer Selling Agreements in the Southern California Area are necessarily and properly interrelated one to the other, particularly in respect of the location limitations hereinabove described. They are a network of agreements which together constitute Chevrolet's plan for the marketing of Chevrolets in the Southern California Area and every dealer has a lawful interest in every other dealer's adherence to the location limitations of said agreements. The Court concludes that defendants Losor Chevrolet Dealers Association, Dealers' Service, Inc. and Foothill Dealers Association, and the member Chevrolet dealers on whose behalf they acted, had a lawful interest in the adherence by all dealers to the location limitations of the Chevrolet marketing plan and had the right (a) to request that the Chevrolet Motor Division take steps to cause Chevrolet dealers to cease conduct which was violative of the location limitation provisions of the Dealer Selling Agreements and (b) to ascertain which Chevrolet dealers were engaging in such conduct and to advise the Chevrolet Motor Division of the facts ascertained.

 15. Defendants Losor Chevrolet Dealers' Association, Dealers' Service, Inc. and Foothill Chevrolet Dealers Association engaged in activities concerned with the passage of legislation and enforcement of the California Motor Vehicle Dealer and Salesman Licensing Laws. (Cal.Veh.Code Sec. 11700 et seq.;

§ 11800 et seq.) As a matter of law, such conduct did not violate the Sherman Act. Eastern Railroad Presidents' Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961).

16. Defendants Losor Chevrolet Dealers Association, Dealers' Service, Inc. and Foothill Chevrolet Dealers Association, individually or as a group, did not engage in any combination or conspiracy in unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act.

Now, Therefore, It Is Hereby Adjudged that the motions of defendants and each of them for a judgment of acquittal are hereby granted and defendants and each of them are hereby adjudged acquitted of every offense charged in the Indictment.